(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## EVENWEL ET AL. *v.* ABBOTT, GOVERNOR OF TEXAS, ET AL.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

No. 14–940.  Argued December 8, 2015—Decided April 4, 2016

Under the one-person, one-vote principle, jurisdictions must design legislative districts with equal populations. See *Wesberry* v. *Sanders*, 376 U. S. 1, 7–8, *Reynolds* v. *Sims*, 377 U. S. 533, 568. In the context of state and local legislative districting, States may deviate somewhat from perfect population equality to accommodate traditional districting objectives. Where the maximum population deviation between the largest and smallest district is less than 10%, a state or local legislative map presumptively complies with the one-person, one-vote rule.

Texas, like all other States, uses total-population numbers from the decennial census when drawing legislative districts. After the 2010 census, Texas adopted a State Senate map that has a maximum total-population deviation of 8.04%, safely within the presumptively permissible 10% range. However, measured by a voter-population baseline—eligible voters or registered voters—the map's maximum population deviation exceeds 40%. Appellants, who live in Texas Senate districts with particularly large eligible- and registered-voter populations, filed suit against the Texas Governor and Secretary of State. Basing apportionment on total population, appellants contended, dilutes their votes in relation to voters in other Senate districts, in violation of the one-person, one-vote principle of the Equal Protection Clause. Appellants sought an injunction barring use of the existing Senate map in favor of a map that would equalize the voter population in each district. A three-judge District Court dismissed the complaint for failure to state a claim on which relief could be granted.

*Held*: As constitutional history, precedent, and practice demonstrate, a

State or locality may draw its legislative districts based on total population. Pp. 7–19.

(a) Constitutional history shows that, at the time of the founding, the Framers endorsed allocating House seats to States based on total population. Debating what would become the Fourteenth Amendment, Congress reconsidered the proper basis for apportioning House seats. Retaining the total-population rule, Congress rejected proposals to allocate House seats to States on the basis of voter population. See U. S. Const., Amdt. 14, §2. The Framers recognized that use of a total-population baseline served the principle of representational equality. Appellants' voter-population rule is inconsistent with the "theory of the Constitution," Cong. Globe, 39th Cong., 1st Sess., 2766–2767, this Court recognized in *Wesberry* as underlying not just the method of allocating House seats to States but also the method of apportioning legislative seats within States. Pp. 8–15.

(b) This Court's past decisions reinforce the conclusion that States and localities may comply with the one-person, one-vote principle by designing districts with equal total populations. Appellants assert that language in this Court's precedent supports their view that States should equalize the voter-eligible population of districts. But for every sentence appellants quote, one could respond with a line casting the one-person, one-vote guarantee in terms of equality of representation. See, *e.g., Reynolds*, 377 U. S., at 560–561. Moreover, from *Reynolds* on, the Court has consistently looked to total-population figures when evaluating whether districting maps violate the Equal Protection Clause by deviating impermissibly from perfect population equality. Pp. 15–18.

(c) Settled practice confirms what constitutional history and prior decisions strongly suggest. Adopting voter-eligible apportionment as constitutional command would upset a well-functioning approach to districting that all 50 States and countless local jurisdictions have long followed. As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible to vote. Nonvoters have an important stake in many policy debates and in receiving constituent services. By ensuring that each representative is subject to requests and suggestions from the same number of constituents, total-population apportionment promotes equitable and effective representation. Pp. 18–19.

(d) Because constitutional history, precedent, and practice reveal the infirmity of appellants' claim, this Court need not resolve whether, as Texas now argues, States may draw districts to equalize voter-eligible population rather than total population. P. 19.

Affirmed.

Syllabus

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. ALITO, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined except as to Part III–B.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–940

SUE EVENWEL, ET AL., APPELLANTS *v.* GREG ABBOTT, GOVERNOR OF TEXAS, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

[April 4, 2016]

JUSTICE GINSBURG delivered the opinion of the Court.

Texas, like all other States, draws its legislative districts on the basis of total population. Plaintiffs-appellants are Texas voters; they challenge this uniform method of districting on the ground that it produces unequal districts when measured by voter-eligible population. Voter-eligible population, not total population, they urge, must be used to ensure that their votes will not be devalued in relation to citizens' votes in other districts. We hold, based on constitutional history, this Court's decisions, and longstanding practice, that a State may draw its legislative districts based on total population.

## I

### A

This Court long resisted any role in overseeing the process by which States draw legislative districts. "The remedy for unfairness in districting," the Court once held, "is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress." *Colegrove* v. *Green*, 328 U. S. 549, 556 (1946). "Courts ought not to enter this political thicket," as Justice Frankfurter put it.

*Ibid.*

Judicial abstention left pervasive malapportionment unchecked. In the opening half of the 20th century, there was a massive population shift away from rural areas and toward suburban and urban communities. Nevertheless, many States ran elections into the early 1960's based on maps drawn to equalize each district's population as it was composed around 1900. Other States used maps allocating a certain number of legislators to each county regardless of its population. These schemes left many rural districts significantly underpopulated in comparison with urban and suburban districts. But rural legislators who benefited from malapportionment had scant incentive to adopt new maps that might put them out of office.

The Court confronted this ingrained structural inequality in *Baker* v. *Carr*, 369 U. S. 186, 191–192 (1962). That case presented an equal protection challenge to a Tennessee state-legislative map that had not been redrawn since 1901. See also *id.,* at 192 (observing that, in the meantime, there had been "substantial growth and redistribution" of the State's population). Rather than steering clear of the political thicket yet again, the Court held for the first time that malapportionment claims are justiciable. *Id.,* at 237 ("We conclude that the complaint's allegations of a denial of equal protection present a justiciable constitutional cause of action upon which appellants are entitled to a trial and a decision.").

Although the Court in *Baker* did not reach the merits of the equal protection claim, *Baker*'s justiciability ruling set the stage for what came to be known as the one-person, one-vote principle. Just two years after *Baker*, in *Wesberry* v. *Sanders*, 376 U. S. 1, 7–8 (1964), the Court invalidated Georgia's malapportioned congressional map, under which the population of one congressional district was "two to three times" larger than the population of the others. Relying on Article I, §2, of the Constitution, the

Opinion of the Court

Court required that congressional districts be drawn with equal populations. *Id.,* at 7, 18. Later that same Term, in *Reynolds* v. *Sims*, 377 U. S. 533, 568 (1964), the Court upheld an equal protection challenge to Alabama's malapportioned state-legislative maps. "[T]he Equal Protection Clause," the Court concluded, "requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Ibid. Wesberry* and *Reynolds* together instructed that jurisdictions must design both congressional and state-legislative districts with equal populations, and must regularly reapportion districts to prevent malapportionment.[1]

Over the ensuing decades, the Court has several times elaborated on the scope of the one-person, one-vote rule. States must draw congressional districts with populations as close to perfect equality as possible. See *Kirkpatrick* v. *Preisler*, 394 U. S. 526, 530–531 (1969). But, when drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them*,* preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness. See *Brown* v. *Thomson*, 462 U. S. 835, 842–843 (1983). Where the maximum population deviation between the largest and smallest district is less than 10%, the Court has held, a state or local legislative map presumptively complies with the one-person, one-vote rule. *Ibid.*[2] Maximum deviations above 10% are

———————

[1] In *Avery* v. *Midland County*, 390 U. S. 474, 485–486 (1968), the Court applied the one-person, one-vote rule to legislative apportionment at the local level.

[2] Maximum population deviation is the sum of the percentage deviations from perfect population equality of the most- and least-populated districts. See *Chapman* v. *Meier*, 420 U. S. 1, 22 (1975). For example, if the largest district is 4.5% overpopulated, and the smallest district is 2.3% underpopulated, the map's maximum population deviation is

presumptively impermissible. *Ibid.* See also *Mahan* v. *Howell*, 410 U. S. 315, 329 (1973) (approving a state-legislative map with maximum population deviation of 16% to accommodate the State's interest in "maintaining the integrity of political subdivision lines," but cautioning that this deviation "may well approach tolerable limits").

In contrast to repeated disputes over the permissibility of deviating from perfect population equality, little controversy has centered on the population base jurisdictions must equalize. On rare occasions, jurisdictions have relied on the registered-voter or voter-eligible populations of districts. See *Burns* v. *Richardson*, 384 U. S. 73, 93–94 (1966) (holding Hawaii could use a registered-voter population base because of "Hawaii's special population problems"—in particular, its substantial temporary military population). But, in the overwhelming majority of cases, jurisdictions have equalized total population, as measured by the decennial census. Today, all States use total-population numbers from the census when designing congressional and state-legislative districts, and only seven States adjust those census numbers in any meaningful way.[3]

_____

6.8%.

  [3] The Constitutions and statutes of ten States—California, Delaware, Hawaii, Kansas, Maine, Maryland, Nebraska, New Hampshire, New York, and Washington—authorize the removal of certain groups from the total-population apportionment base. See App. to Brief for Appellees 1a–46a (listing relevant state constitutional and statutory provisions). Hawaii, Kansas, and Washington exclude certain non-permanent residents, including nonresident members of the military. Haw. Const., Art. IV, §4; Kan. Const., Art. 10, §1(a); Wash. Const., Art. II, §43(5). See also N. H. Const., pt. 2, Art. 9–a (authorizing the state legislature to make "suitable adjustments to the general census . . . on account of non-residents temporarily residing in this state"). California, Delaware, Maryland, and New York exclude inmates who were domiciled out-of-state prior to incarceration. Cal. Elec. Code Ann. §21003(5) (2016 West Cum. Supp.); Del. Code Ann., Tit. 29, §804A (Supp. 2014); Md. State Govt. Code Ann. §2–2A–01 (2014); N. Y. Legis.

B

Appellants challenge that consensus. After the 2010 census, Texas redrew its State Senate districts using a total-population baseline. At the time, Texas was subject to the preclearance requirements of §5 of the Voting Rights Act of 1965. 52 U. S. C. §10304 (requiring jurisdictions to receive approval from the U. S. Department of Justice or the U. S. District Court for the District of Columbia before implementing certain voting changes). Once it became clear that the new Senate map, S148, would not receive preclearance in advance of the 2012 elections, the U. S. District Court for the Western District of Texas drew an interim Senate map, S164, which also equalized the total population of each district. See *Davis* v. *Perry*, No. SA–11–CV–788 (Nov. 23, 2011).[4] On direct appeal, this Court observed that the District Court had failed to "take guidance from the State's recently enacted plan in drafting an interim plan," and therefore vacated the District Court's map. *Perry* v. *Perez*, 565 U. S. ___, ___, ___–___ (2012) (*per curiam*) (slip op., at 4, 8–10).

The District Court, on remand, again used census data to draw districts so that each included roughly the same size total population. Texas used this new interim map, S172, in the 2012 elections, and, in 2013, the Texas Legis-

_____

Law Ann. §83–m(b) (2015 West Cum. Supp.). The Constitutions of Maine and Nebraska authorize the exclusion of noncitizen immigrants, Me. Const., Art. IV, pt. 1, §2; Neb. Const., Art. III, §5, but neither provision is "operational as written," Brief for United States as *Amicus Curiae* 12, n. 3.

[4] Various plaintiffs had challenged Texas' State House, State Senate, and congressional maps under, *inter alia*, §2 of the Voting Rights Act of 1965. They sought and received an injunction barring Texas' use of the new maps until those maps received §5 preclearance. See *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 561 (1969) ("[A]n individual may bring a suit for declaratory judgment and injunctive relief, claiming that a state requirement is covered by §5, but has not been subjected to the required federal scrutiny.").

lature adopted S172 as the permanent Senate map. See App. to Brief for Texas Senate Hispanic Caucus et al. as *Amici Curiae* 5 (reproducing the current Senate map). The permanent map's maximum total-population deviation is 8.04%, safely within the presumptively permissible 10% range. But measured by a voter-population baseline—eligible voters or registered voters—the map's maximum population deviation exceeds 40%.

Appellants Sue Evenwel and Edward Pfenninger live in Texas Senate districts (one and four, respectively) with particularly large eligible- and registered-voter populations. Contending that basing apportionment on total population dilutes their votes in relation to voters in other Senate districts, in violation of the one-person, one-vote principle of the Equal Protection Clause,[5] appellants filed suit in the U. S. District Court for the Western District of Texas. They named as defendants the Governor and Secretary of State of Texas, and sought a permanent injunction barring use of the existing Senate map in favor of a map that would equalize the voter population in each district.

The case was referred to a three-judge District Court for hearing and decision. See 28 U. S. C. §2284(a); *Shapiro* v. *McManus*, 577 U. S. ___, ___–___ (2015) (slip op., at 5–7). That court dismissed the complaint for failure to state a claim on which relief could be granted. Appellants, the District Court explained, "rel[y] upon a theory never before accepted by the Supreme Court or any circuit court: that the metric of apportionment employed by Texas (total population) results in an unconstitutional apportionment because it does not achieve equality as measured by Plaintiffs' chosen metric—voter population." App. to Juris.

———————

[5] Apart from objecting to the baseline, appellants do not challenge the Senate map's 8.04% total-population deviation. Nor do they challenge the use of a total-population baseline in congressional districting.

Opinion of the Court

Statement 9a. Decisions of this Court, the District Court concluded, permit jurisdictions to use any neutral, nondiscriminatory population baseline, including total population, when drawing state and local legislative districts. *Id.,* at 13a–14a.[6]

We noted probable jurisdiction, 575 U. S. \_\_\_ (2015), and now affirm.

## II

The parties and the United States advance different positions in this case. As they did before the District Court, appellants insist that the Equal Protection Clause requires jurisdictions to draw state and local legislative districts with equal voter-eligible populations, thus protecting "voter equality," *i.e.,* "the right of eligible voters to an equal vote." Brief for Appellants 14.[7] To comply with their proposed rule, appellants suggest, jurisdictions should design districts based on citizen-voting-age-population (CVAP) data from the Census Bureau's American Community Survey (ACS), an annual statistical sample of the U. S. population. Texas responds that jurisdictions may, consistent with the Equal Protection Clause, design districts using any population baseline—including

————————

[6] As the District Court noted, the Ninth Circuit has likewise rejected appellants' theory, *i.e.,* that voter population must be roughly equalized. See *Garza* v. *County of L. A.*, 918 F. 2d 763, 773–776 (CA9 1990). Also declining to mandate voter-eligible apportionment, the Fourth and Fifth Circuits have suggested that the choice of apportionment base may present a nonjusticiable political question. See *Chen* v. *Houston*, 206 F. 3d 502, 528 (CA5 2000) ("[T]his eminently political question has been left to the political process."); *Daly* v. *Hunt*, 93 F. 3d 1212, 1227 (CA4 1996) ("This is quintessentially a decision that should be made by the state, not the federal courts, in the inherently political and legislative process of apportionment.").

[7] In the District Court, appellants suggested that districting bodies could also comply with the one-person, one-vote rule by equalizing the registered-voter populations of districts, but appellants have not repeated that argument before this Court. See Tr. of Oral Arg. 22–23.

total population and voter-eligible population—so long as the choice is rational and not invidiously discriminatory. Although its use of total-population data from the census was permissible, Texas therefore argues, it could have used ACS CVAP data instead. Sharing Texas' position that the Equal Protection Clause does not mandate use of voter-eligible population, the United States urges us not to address Texas' separate assertion that the Constitution allows States to use alternative population baselines, including voter-eligible population. Equalizing total population, the United States maintains, vindicates the principle of representational equality by "ensur[ing] that the voters in each district have the power to elect a representative who represents the same number of constituents as all other representatives." Brief for United States as *Amicus Curiae* 5.

In agreement with Texas and the United States, we reject appellants' attempt to locate a voter-equality mandate in the Equal Protection Clause. As history, precedent, and practice demonstrate, it is plainly permissible for jurisdictions to measure equalization by the total population of state and local legislative districts.

## A

We begin with constitutional history. At the time of the founding, the Framers confronted a question analogous to the one at issue here: On what basis should congressional districts be allocated to States? The Framers' solution, now known as the Great Compromise, was to provide each State the same number of seats in the Senate, and to allocate House seats based on States' total populations. "Representatives and direct Taxes," they wrote, "shall be apportioned among the several States which may be included within this Union, *according to their respective Numbers*." U. S. Const., Art. I, §2, cl. 3 (emphasis added). "It is a fundamental principle of the proposed constitu-

tion," James Madison explained in the Federalist Papers, "that as the aggregate number of representatives allotted to the several states, is to be . . . founded on the aggregate number of inhabitants; so, the right of choosing this allotted number in each state, is to be exercised by such part of the inhabitants, as the state itself may designate." The Federalist No. 54, p. 284 (G. Carey & J. McClellan eds. 2001). In other words, the basis of *representation* in the House was to include all inhabitants—although slaves were counted as only three-fifths of a person—even though States remained free to deny many of those inhabitants the right to participate in the selection of their representatives.[8] Endorsing apportionment based on total population, Alexander Hamilton declared: "There can be no truer principle than this—that every individual of the community at large has an equal right to the protection of government." 1 Records of the Federal Convention of 1787, p. 473 (M. Farrand ed. 1911).[9]

————————

[8] As the United States observes, the "choice of constitutional language reflects the historical fact that when the Constitution was drafted and later amended, the right to vote was not closely correlated with citizenship." Brief for United States as *Amicus Curiae* 18. Restrictions on the franchise left large groups of citizens, including women and many males who did not own land, unable to cast ballots, yet the Framers understood that these citizens were nonetheless entitled to representation in government.

[9] JUSTICE ALITO observes that Hamilton stated this principle while opposing allocation of an equal number of Senate seats to each State. *Post,* at 7–8 (opinion concurring in judgment). That context, however, does not diminish Hamilton's principled argument for allocating seats to protect the representational rights of "every individual of the community at large." 1 Records of the Federal Convention of 1787, p. 473 (M. Farrand ed. 1911). JUSTICE ALITO goes on to quote James Madison for the proposition that Hamilton was concerned, simply and only, with "the outcome of a contest over raw political power." *Post,* at 8. Notably, in the statement JUSTICE ALITO quotes, Madison was not attributing that motive to Hamilton; instead, according to Madison, Hamilton was attributing that motive to the advocates of equal representation for States. Farrand, *supra,* at 466. One need not gainsay that Hamilton's

When debating what is now the Fourteenth Amendment, Congress reconsidered the proper basis for apportioning House seats. Concerned that Southern States would not willingly enfranchise freed slaves, and aware that "a slave's freedom could swell his state's population for purposes of representation in the House by one person, rather than only three-fifths," the Framers of the Fourteenth Amendment considered at length the possibility of allocating House seats to States on the basis of voter population. J. Sneed, Footprints on the Rocks of the Mountain: An Account of the Enactment of the Fourteenth Amendment 28 (1997). See also *id.,* at 35 ("[T]he apportionment issue consumed more time in the Fourteenth Amendment debates than did any other topic.").

In December 1865, Thaddeus Stevens, a leader of the Radical Republicans, introduced a constitutional amendment that would have allocated House seats to States "according to their respective legal voters"; in addition, the proposed amendment mandated that "[a] true census of the legal voters shall be taken at the same time with the regular census." Cong. Globe, 39th Cong., 1st Sess., 10 (1866). Supporters of apportionment based on voter population employed the same voter-equality reasoning that appellants now echo. See, *e.g., id.,* at 380 (remarks of Rep. Orth) ("[T]he true principle of representation in Congress is that voters alone should form the basis, and that each voter should have equal political weight in our Government. . . ."); *id.,* at 404 (remarks of Rep. Lawrence) (use of total population "disregards the fundamental idea of all just representation, that every voter should be equal in political power all over the Union").

—————

backdrop was the political controversies of his day. That reality, however, has not deterred this Court's past reliance on his statements of principle. See, *e.g., Printz* v. *United States*, 521 U. S. 898, 910–924 (1997).

Voter-based apportionment proponents encountered fierce resistance from proponents of total-population apportionment. Much of the opposition was grounded in the principle of representational equality. "As an abstract proposition," argued Representative James G. Blaine, a leading critic of allocating House seats based on voter population, "no one will deny that population is the true basis of representation; for women, children, and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot." *Id.,* at 141. See also *id.,* at 358 (remarks of Rep. Conkling) (arguing that use of a voter-population basis "would shut out four fifths of the citizens of the country— women and children, who are citizens, who are taxed, and who are, and always have been, represented"); *id.,* at 434 (remarks of Rep. Ward) ("[W]hat becomes of that large class of non-voting tax-payers that are found in every section? Are they in no matter to be represented? They certainly should be enumerated in making up the whole number of those entitled to a representative.").

The product of these debates was §2 of the Fourteenth Amendment, which retained total population as the congressional apportionment base. See U. S. Const., Amdt. 14, §2 ("Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."). Introducing the final version of the Amendment on the Senate floor, Senator Jacob Howard explained:

"[The] basis of representation is numbers . . . ; that is, the whole population except untaxed Indians and persons excluded by the State laws for rebellion or other crime. . . . The committee adopted numbers as the most just and satisfactory basis, and this is the principle upon which the Constitution itself was originally

> framed, that the basis of representation should de-
> pend upon numbers; and such, I think, after all, is the
> safest and most secure principle upon which the Gov-
> ernment can rest.  Numbers, not voters; numbers, not
> property; this is the theory of the Constitution."
> Cong. Globe, 39th Cong., 1st Sess., 2766–2767 (1866).

Appellants ask us to find in the Fourteenth Amend-
ment's Equal Protection Clause a rule inconsistent with
this "theory of the Constitution."  But, as the Court recog-
nized in *Wesberry*, this theory underlies not just the method
of allocating House seats to States; it applies as well to
the method of apportioning legislative seats within States.
"The debates at the [Constitutional] Convention," the
Court explained, "make at least one fact abundantly clear:
that when the delegates agreed that the House should
represent 'people,' they intended that in allocating Con-
gressmen the number assigned to each state should be
determined solely by the number of inhabitants."  376
U. S., at 13.  "While it may not be possible to draw con-
gressional districts with mathematical precision," the
Court acknowledged, "that is no excuse for ignoring our
Constitution's plain objective of making equal representa-
tion for *equal numbers of people* the fundamental goal
for the House of Representatives."  *Id.,* at 18 (emphasis
added).  It cannot be that the Fourteenth Amendment calls
for the apportionment of congressional districts based on
total population, but simultaneously prohibits States from
apportioning their own legislative districts on the same
basis.

Cordoning off the constitutional history of congressional
districting, appellants stress two points.[10]   First, they

---

[10] JUSTICE ALITO adds a third, claiming "the allocation of congres-
sional representation sheds little light" on the meaning of the one-person,
one-vote rule "because that allocation plainly violates one person, one
vote."  *Post,* at 4.  For this proposition, JUSTICE ALITO notes the consti-

draw a distinction between allocating seats *to* States, and apportioning seats *within* States. The Framers selected total population for the former, appellants and their *amici* argue, because of federalism concerns inapposite to intrastate districting. These concerns included the perceived risk that a voter-population base might encourage States to expand the franchise unwisely, and the hope that a total-population base might counter States' incentive to undercount their populations, thereby reducing their share of direct taxes. *Wesberry*, however, rejected the distinction appellants now press. See *supra,* at 12. Even without the weight of *Wesberry*, we would find appellants' distinction unconvincing. One can accept that federalism—or, as JUSTICE ALITO emphasizes, partisan and regional political advantage, see *post,* at 6–13—figured in the Framers' selection of total population as the basis for allocating congressional seats. Even so, it remains beyond doubt that the principle of representational equality figured prominently in the decision to count people, whether or not they qualify as voters.[11]

————————

tutional guarantee of two Senate seats and at least one House seat to each State, regardless of its population. But these guarantees bear no kinship to the separate question that dominated the Fourteenth Amendment's ratification debates: After each State has received its guaranteed House seat, on what basis should additional seats be allocated?

[11] JUSTICE ALITO asserts that we have taken the statements of the Fourteenth Amendment's Framers "out of context." *Post,* at 9. See also *post,* at 12 ("[C]laims about representational equality were invoked, if at all, only in service of the *real* goal: preventing southern States from acquiring too much power in the national government."). Like Alexander Hamilton, see *supra,* at 9, n. 9, the Fourteenth Amendment's Framers doubtless made arguments rooted in practical political realities as well as in principle. That politics played a part, however, does not warrant rejecting principled argument. In any event, motivations aside, the Framers' ultimate choice of total population rather than voter population is surely relevant to whether, as appellants now argue, the Equal Protection Clause *mandates* use of voter population

Second, appellants and JUSTICE ALITO urge, see *post,* at 5–6, the Court has typically refused to analogize to features of the federal electoral system—here, the constitutional scheme governing congressional apportionment— when considering challenges to state and local election laws. True, in *Reynolds*, the Court rejected Alabama's argument that it had permissibly modeled its State Senate apportionment scheme—one Senator for each county—on the United States Senate. "[T]he federal analogy," the Court explained, "[is] inapposite and irrelevant to state legislative districting schemes" because "[t]he system of representation in the two Houses of the Federal Congress" arose "from unique historical circumstances." 377 U. S., at 573–574. Likewise, in *Gray* v. *Sanders*, 372 U. S. 368, 371–372, 378 (1963), Georgia unsuccessfully attempted to defend, by analogy to the electoral college, its scheme of assigning a certain number of "units" to the winner of each county in statewide elections.

*Reynolds* and *Gray*, however, involved features of the federal electoral system that contravene the principles of both voter *and* representational equality to favor interests that have no relevance outside the federal context. Senate seats were allocated to States on an equal basis to respect state sovereignty and increase the odds that the smaller States would ratify the Constitution. See *Wesberry*, 376 U. S., at 9–13 (describing the history of the Great Compromise). See also *Reynolds*, 377 U. S., at 575 ("Political subdivisions of States—counties, cities, or whatever— never were and never have been considered as sovereign entities. . . . The relationship of the States to the Federal Government could hardly be less analogous."). "The [Electoral] College was created to permit the most knowledgeable members of the community to choose the executive of a nation whose continental dimensions were thought to

_____

rather than total population.

preclude an informed choice by the citizenry at large." *Williams* v. *Rhodes*, 393 U. S. 23, 43–44 (1968) (Harlan, J., concurring in result). See also *Gray*, 372 U. S., at 378 ("The inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent numerical inequality." (footnote omitted)). By contrast, as earlier developed, the constitutional scheme for congressional apportionment rests in part on the same representational concerns that exist regarding state and local legislative districting. The Framers' answer to the apportionment question in the congressional context therefore undermines appellants' contention that districts must be based on voter population.

B

Consistent with constitutional history, this Court's past decisions reinforce the conclusion that States and localities may comply with the one-person, one-vote principle by designing districts with equal total populations. Quoting language from those decisions that, in appellants' view, supports the principle of equal voting power—and emphasizing the phrase "one-person, one-vote"—appellants contend that the Court had in mind, and constantly meant, that States should equalize the voter-eligible population of districts. See *Reynolds*, 377 U. S., at 568 ("[A]n individual's right to vote for State legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living on other parts of the State."); *Gray*, 372 U. S., at 379–380 ("The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications."). See also *Hadley* v. *Junior College Dist. of Metropolitan Kansas City*, 397 U. S. 50, 56 (1970) ("[W]hen members of an elected body are chosen from separate districts, each

district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."). Appellants, however, extract far too much from selectively chosen language and the "one-person, one-vote" slogan.

For every sentence appellants quote from the Court's opinions, one could respond with a line casting the one-person, one-vote guarantee in terms of equality of representation, not voter equality. In *Reynolds*, for instance, the Court described "the fundamental principle of representative government in this country" as "one of equal representation for equal numbers of people." 377 U. S., at 560–561. See also *Davis* v. *Bandemer*, 478 U. S. 109, 123 (1986) ("[I]n formulating the one person, one vote formula, the Court characterized the question posed by election districts of disparate size as an issue of fair representation."); *Reynolds*, 377 U. S., at 563 (rejecting state districting schemes that "give the same number of representatives to unequal numbers of constituents"). And the Court has suggested, repeatedly, that districting based on total population serves *both* the State's interest in preventing vote dilution *and* its interest in ensuring equality of representation. See *Board of Estimate of City of New York* v. *Morris*, 489 U. S. 688, 693–694 (1989) ("If districts of widely unequal population elect an equal number of representatives, the voting power of each citizen in the larger constituencies is debased and the citizens in those districts have a smaller share of representation than do those in the smaller districts."). See also *Kirkpatrick*, 394 U. S., at 531 (recognizing in a congressional-districting case that "[e]qual representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives").[12]

—————

[12] Appellants also observe that standing in one-person, one-vote cases has rested on plaintiffs' status as voters whose votes were diluted. But

Moreover, from *Reynolds* on, the Court has consistently looked to total-population figures when evaluating whether districting maps violate the Equal Protection Clause by deviating impermissibly from perfect population equality. See Brief for Appellees 29–31 (collecting cases brought under the Equal Protection Clause). See also *id.,* at 31, n. 9 (collecting congressional-districting cases). Appellants point to no instance in which the Court has determined the permissibility of deviation based on eligible- or registered-voter data. It would hardly make sense for the Court to have mandated voter equality *sub silentio* and then used a total-population baseline to evaluate compliance with that rule. More likely, we think, the Court has always assumed the permissibility of drawing districts to equalize total population.

"In the 1960s," appellants counter, "the distribution of the voting population generally did not deviate from the distribution of total population to the degree necessary to raise this issue." Brief for Appellants 27. To support this assertion, appellants cite only a District Court decision, which found no significant deviation in the distribution of voter and total population in "densely populated areas of New York State." *WMCA, Inc.* v. *Lomenzo*, 238 F. Supp. 916, 925 (SDNY), aff'd, 382 U. S. 4 (1965) (*per curiam*). Had this Court assumed such equivalence on a national scale, it likely would have said as much.[13] Instead, in *Gaffney* v. *Cummings*, 412 U. S. 735, 746–747 (1973), the Court acknowledged that voters may be distributed un-

-------

the Court has not considered the standing of nonvoters to challenge a map malapportioned on a total-population basis. This issue, moreover, is unlikely ever to arise given the ease of finding voters willing to serve as plaintiffs in malapportionment cases.

[13] In contrast to the insubstantial evidence marshaled by appellants, the United States cites several studies documenting the uneven distribution of immigrants throughout the country during the 1960's. See Brief for United States as *Amicus Curiae* 16.

evenly within jurisdictions. "[I]f it is the weight of a person's vote that matters," the Court observed, then "total population—even if stable and accurately taken—may not actually reflect that body of voters whose votes must be counted and weighed for the purposes of reapportionment, because 'census persons' are not voters." *Id.,* at 746. Nonetheless, the Court in *Gaffney* recognized that the one-person, one-vote rule is designed to facilitate "[f]air and effective representation," *id.,* at 748, and evaluated compliance with the rule based on total population alone, *id.,* at 750.

## C

What constitutional history and our prior decisions strongly suggest, settled practice confirms. Adopting voter-eligible apportionment as constitutional command would upset a well-functioning approach to districting that all 50 States and countless local jurisdictions have followed for decades, even centuries. Appellants have shown no reason for the Court to disturb this longstanding use of total population. See *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 678 (1970) ("unbroken practice" followed "openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside"). See also *Burson* v. *Freeman*, 504 U. S. 191, 203–206 (1992) (plurality opinion) (upholding a law limiting campaigning in areas around polling places in part because all 50 States maintain such laws, so there is a "widespread and time-tested consensus" that legislation of this order serves important state interests). As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote. See *supra,* at 8–12. Nonvoters have an important stake in many policy debates—children, their parents, even their grandparents, for example, have a stake in a strong public-education

Opinion of the Court

system—and in receiving constituent services, such as help navigating public-benefits bureaucracies. By ensuring that each representative is subject to requests and suggestions from the same number of constituents, total-population apportionment promotes equitable and effective representation. See *McCormick* v. *United States*, 500 U. S. 257, 272 (1991) ("Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator.").[14]

In sum, the rule appellants urge has no mooring in the Equal Protection Clause. The Texas Senate map, we therefore conclude, complies with the requirements of the one-person, one-vote principle.[15] Because history, precedent, and practice suffice to reveal the infirmity of appellants' claims, we need not and do not resolve whether, as Texas now argues, States may draw districts to equalize voter-eligible population rather than total population.

\* \* \*

For the reasons stated, the judgment of the United States District Court for the Western District of Texas is

*Affirmed.*

---

[14] Appellants point out that constituents have no constitutional right to equal access to their elected representatives. But a State certainly has an interest in taking reasonable, nondiscriminatory steps to facilitate access for all its residents.

[15] Insofar as appellants suggest that Texas could have roughly equalized both total population and eligible-voter population, this Court has never required jurisdictions to use multiple population baselines. In any event, appellants have never presented a map that manages to equalize both measures, perhaps because such a map does not exist, or because such a map would necessarily ignore other traditional redistricting principles, including maintaining communities of interest and respecting municipal boundaries.

# SUPREME COURT OF THE UNITED STATES

—————

No. 14–940

—————

## SUE EVENWEL, ET AL., APPELLANTS v. GREG ABBOTT, GOVERNOR OF TEXAS, ET AL.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

[April 4, 2016]

JUSTICE THOMAS, concurring in the judgment.

This case concerns whether Texas violated the Equal Protection Clause—as interpreted by the Court's one-person, one-vote cases—by creating legislative districts that contain approximately equal total population but vary widely in the number of eligible voters in each district. I agree with the majority that our precedents do not require a State to equalize the total number of voters in each district. States may opt to equalize total population. I therefore concur in the majority's judgment that appellants' challenge fails.

I write separately because this Court has never provided a sound basis for the one-person, one-vote principle. For 50 years, the Court has struggled to define what right that principle protects. Many of our precedents suggest that it protects the right of eligible voters to cast votes that receive equal weight. Despite that frequent explanation, our precedents often conclude that the Equal Protection Clause is satisfied when all individuals within a district—voters or not—have an equal share of representation. The majority today concedes that our cases have not produced a clear answer on this point. See *ante,* at 16.

In my view, the majority has failed to provide a sound basis for the one-person, one-vote principle because no such basis exists. The Constitution does not prescribe any

one basis for apportionment within States. It instead leaves States significant leeway in apportioning their own districts to equalize total population, to equalize eligible voters, or to promote any other principle consistent with a republican form of government. The majority should recognize the futility of choosing only one of these options. The Constitution leaves the choice to the people alone— not to this Court.

## I

In the 1960's, this Court decided that the Equal Protection Clause requires States to draw legislative districts based on a "one-person, one-vote" rule.* But this Court's decisions have never coalesced around a single theory about what States must equalize.

The Equal Protection Clause prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." Amdt. 14, §1. For nearly a century after its ratification, this Court interpreted the Clause as having no application to the politically charged issue of how States should apportion their populations in political districts. See, *e.g., Colegrove* v. *Green*, 328 U. S. 549, 556 (1946) (plurality opinion). Instead, the Court left the drawing of States' political boundaries to the States, so long as a State did not deprive people of the right to vote for reasons prohibited by the Constitution. See *id.,* at 552, 556; *Gomillion* v. *Lightfoot*, 364 U. S. 339, 341, 347–348 (1960) (finding justiciable a claim that a city boundary

---

*The Court's opinions have used "one person, one vote" and "one man, one vote" interchangeably. Compare, *e.g., Gray* v. *Sanders*, 372 U. S. 368, 381 (1963) ("one person, one vote"), with *Hadley* v. *Junior College Dist. of Metropolitan Kansas City*, 397 U. S. 50, 51 (1970) ("one man, one vote" (internal quotation marks omitted)). *Gray* used "one person, one vote" after noting the expansion of political equality over our history—including adoption of the Nineteenth Amendment, which guaranteed women the right to vote. 372 U. S., at 381.

was redrawn from a square shape to "a strangely irregular twenty-eight-sided figure" to remove nearly all black voters from the city). This meant that a State's refusal to allocate voters within districts based on population changes was a matter for States—not federal courts—to decide. And these cases were part of a larger jurisprudence holding that the question whether a state government had a "proper" republican form rested with Congress. *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118, 149–150 (1912).

This Court changed course in *Baker* v. *Carr*, 369 U. S. 186 (1962), by locating in the Equal Protection Clause a right of citizens not to have a "'debasement of their votes.'" *Id.*, at 194, and n. 15, 200. Expanding on that decision, this Court later held that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds* v. *Sims*, 377 U. S. 533, 568 (1964). The Court created an analogous requirement for congressional redistricting rooted in Article I, §2's requirement that "Representatives be chosen 'by the People of the several States.'" *Wesberry* v. *Sanders*, 376 U. S. 1, 7–9 (1964). The rules established by these cases have come to be known as "one person, one vote."

Since *Baker* empowered the federal courts to resolve redistricting disputes, this Court has struggled to explain whether the one-person, one-vote principle ensures equality among eligible voters or instead protects some broader right of every citizen to equal representation. The Court's lack of clarity on this point, in turn, has left unclear whether States must equalize the number of eligible voters across districts or only total population.

In a number of cases, this Court has said that States must protect the right of *eligible voters* to have their votes receive equal weight. On this view, there is only one way for States to comply with the one-person, one-vote princi-

ple: they must draw districts that contain a substantially equal number of eligible voters per district.

The Court's seminal decision in *Baker* exemplifies this view. Decided in 1962, *Baker* involved the failure of the Tennessee Legislature to reapportion its districts for 60 years. 369 U. S., at 191. Since Tennessee's last apportionment, the State's population had grown by about 1.5 million residents, from about 2 to more than 3.5 million. And the number of voters in each district had changed significantly over time, producing widely varying voting populations in each district. *Id.*, at 192. Under these facts, the Court held that reapportionment claims were justiciable because the plaintiffs—who all claimed to be eligible voters—had alleged a "debasement of their votes." *Id.*, at 194, and n. 15, 204 (internal quotation marks omitted).

The Court similarly emphasized equal treatment of eligible voters in *Gray* v. *Sanders*, 372 U. S. 368 (1963). That case involved a challenge to Georgia's "county unit" system of voting. *Id.*, at 370. This system, used by the State's Democratic Party to nominate candidates in its primary, gave each county two votes for every representative that the county had in the lower House of its General Assembly. Voting was then done by county, with the winner in each county taking all of that county's votes. The Democratic Party nominee was the candidate who had won the most county-unit votes, not the person who had won the most individual votes. *Id.*, at 370–371. The effect of this system was to give heavier weight to rural ballots than to urban ones. The Court held that the system violated the one-person, one-vote principle. *Id.*, at 379–381, and n. 12. In so holding, the Court emphasized that the right at issue belongs to "all qualified voters" and is the right to have one's vote "counted once" and protected against dilution. *Id.*, at 380.

In applying the one-person, one-vote principle to state

legislative districts, the Court has also emphasized vote dilution, which also supports the notion that the one-person, one-vote principle ensures equality among eligible voters. It did so most notably in *Reynolds*. In that case, Alabama had failed to reapportion its state legislature for decades, resulting in population-variance ratios of up to about 41 to 1 in the State Senate and up to about 16 to 1 in the House. 377 U. S., at 545. In explaining why Alabama's failure to reapportion violated the Equal Protection Clause, this Court stated that "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Id.*, at 568.

This Court's post-*Reynolds* decisions likewise define the one-person, one-vote principle in terms of eligible voters, and thus imply that States should be allocating districts with eligible voters in mind. The Court suggested as much in *Hadley* v. *Junior College Dist. of Metropolitan Kansas City*, 397 U. S. 50 (1970). That case involved Missouri's system permitting separate school districts to establish a joint junior college district. Six trustees were to oversee the joint district, and they were apportioned on the basis of the relative numbers of school-aged children in each subsidiary district. *Id.,* at 51. The Court held that this plan violated the Equal Protection Clause because "the trustees of this junior college district [must] be apportioned in a manner that does not deprive any voter of his right to have his own vote given as much weight, as far as is practicable, as that of any other voter in the junior college district." *Id.,* at 52. In so holding, the Court emphasized that *Reynolds* had "called attention to prior cases indicating that a qualified voter has a constitutional right to vote in elections without having his vote wrongfully denied, debased, or diluted." *Hadley*, 397 U. S., at 52; see *id.,* at 52–53.

In contrast to this oft-stated aspiration of giving equal treatment to eligible voters, the Court has also expressed a different understanding of the one-person, one-vote principle. In several cases, the Court has suggested that one-person, one-vote protects the interests of *all* individuals in a district, whether they are eligible voters or not. In *Reynolds*, for example, the Court said that "the fundamental principle of representative government in this country is one of equal representation for equal numbers of people." 377 U. S., at 560–561; see also *ante,* at 16 (collecting cases). Under this view, States cannot comply with the Equal Protection Clause by equalizing the number of eligible voters in each district. They must instead equalize the total population per district.

In line with this view, the Court has generally focused on total population, not the total number of voters, when determining a State's compliance with the one-person, one-vote requirement. In *Gaffney* v. *Cummings*, 412 U. S. 735, 750–751 (1973), for example, the Court upheld state legislative districts that had a maximum deviation of 7.83% when measured on a total-population basis. In contrast, in *Chapman* v. *Meier*, 420 U. S. 1, 21–22, 26–27 (1975), the Court struck down a court-ordered reapportionment that had a total deviation of 20.14% based on total population. This plan, in the Court's view, failed to "achieve the goal of population equality with little more than *de minimis* variation." *Id.,* at 27.

This lack of clarity in our redistricting cases has left States with little guidance about how their political institutions must be structured. Although this Court has required that state legislative districts "be apportioned on a population basis," *Reynolds*, *supra*, at 568, it has yet to tell the States whether they are limited in choosing "the relevant population that [they] must equally distribute." *Chen* v. *Houston*, 532 U. S. 1046, 1047 (2001) (THOMAS, J., dissenting from denial of certiorari) (internal quotation

marks omitted). Because the Court has not provided a firm account of what States must do when districting, States are left to guess how much flexibility (if any) they have to use different methods of apportionment.

## II

This inconsistency (if not opacity) is not merely a consequence of the Court's equivocal statements on one person, one vote. The problem is more fundamental. There is simply no way to make a principled choice between interpreting one person, one vote as protecting eligible voters or as protecting total inhabitants within a State. That is because, though those theories are noble, the Constitution does not make either of them the exclusive means of apportionment for state and local representatives. In guaranteeing to the States a "Republican Form of Government," Art. IV, §4, the Constitution did not resolve whether the ultimate basis of representation is the right of citizens to cast an equal ballot or the right of all inhabitants to have equal representation. The Constitution instead reserves these matters to the people. The majority's attempt today to divine a single "'theory of the Constitution'"—apportionment based on representation, *ante,* at 12 (quoting Cong. Globe, 39th Cong., 1st Sess., 2766–2767 (1866))—rests on a flawed reading of history and wrongly picks one side of a debate that the Framers did not resolve in the Constitution.

## A

The Constitution lacks a single, comprehensive theory of representation. The Framers understood the tension between majority rule and protecting fundamental rights from majorities. This understanding led to a "mixed" constitutional structure that did not embrace any single theory of representation but instead struck a compromise between those who sought an equitable system of repre-

sentation and those who were concerned that the majority would abuse plenary control over public policy. As Madison wrote, "A dependence on the people is no doubt the primary controul on the government; but experience has taught mankind the necessity of auxiliary precautions." The Federalist No. 51, p. 349 (J. Cooke ed. 1961). *This* was the theory of the Constitution. The Framers therefore made difficult compromises on the apportionment of federal representation, and they did not prescribe any one theory of how States had to divide their legislatures.

1

Because, in the view of the Framers, ultimate political power derives from citizens who were "created equal," The Declaration of Independence ¶2, beliefs in equality of representation—and by extension, majority rule—influenced the constitutional structure. In the years between the Revolution and the framing, the Framers experimented with different ways of securing the political system against improper influence. Of all the "electoral safeguards for the representational system," the most critical was "equality of representation." G. Wood, The Creation of the American Republic 1776–1787, p. 170 (1998) (Wood).

The Framers' preference for apportionment by representation (and majority rule) was driven partially by the belief that all citizens were inherently equal. In a system where citizens were equal, a legislature should have "equal representation" so that "equal interests among the people should have equal interests in [the assembly]." Thoughts on Government, in 4 Works of John Adams 195 (C. Adams ed. 1851). The British Parliament fell short of this goal. In addition to having hereditary nobility, more than half of the members of the democratic House of Commons were elected from sparsely populated districts—so-called "rotten boroughs." Wood 171; *Baker*, 369 U. S.,

at 302–303 (Frankfurter, J., dissenting).

The Framers' preference for majority rule also was a reaction to the shortcomings of the Articles of Confederation. Under the Articles, each State could cast one vote regardless of population and Congress could act only with the assent of nine States. Articles of Confederation, Art. IX, cl. 6; *id.*, Art. X; *id.*, Art. XI. This system proved undesirable because a few small States had the ability to paralyze the National Legislature. See The Federalist No. 22, at 140–141 (Hamilton).

Consequently, when the topic of dividing representation came up at the Constitutional Convention, some Framers advocated proportional representation throughout the National Legislature. 1 Records of the Federal Convention of 1787, pp. 471–473 (M. Farrand ed. 1911). Alexander Hamilton voiced concerns about the unfairness of allowing a minority to rule over a majority. In explaining at the Convention why he opposed giving States an equal vote in the National Legislature, Hamilton asked rhetorically, "If . . . three states contain a majority of the inhabitants of America, ought they to be governed by a minority?" *Id.,* at 473; see also The Federalist No. 22, at 141 (Hamilton) (objecting to supermajoritarian voting requirements because they allow an entrenched minority to "controul the opinion of a majority respecting the best mode of conducting [the public business]"). James Madison, too, opined that the general Government needed a direct mandate from the people. If federal "power [were] not immediately derived from the people, in proportion to their numbers," according to Madison, the Federal Government would be as weak as Congress under the Articles of Confederation. 1 Records of the Federal Convention of 1787, at 472.

In many ways, the Constitution reflects this preference for majority rule. To pass Congress, ordinary legislation requires a simple majority of present members to vote in

favor. And some features of the apportionment for the House of Representatives reflected the idea that States should wield political power in approximate proportion to their number of inhabitants. *Ante*, at 8–12. Thus, "equal representation for equal numbers of people," *ante*, at 12 (internal quotation marks and emphasis omitted), features prominently in how representatives are apportioned among the States. These features of the Constitution reflect the preference of some members of the founding generation for equality of representation. But, as explained below, this is not the single "theory of the Constitution."

2

The Framers also understood that unchecked majorities could lead to tyranny of the majority. As a result, many viewed antidemocratic checks as indispensable to republican government. And included among the antidemocratic checks were legislatures that deviated from perfect equality of representation.

The Framers believed that a proper government promoted the common good. They conceived this good as objective and not inherently coextensive with majoritarian preferences. *See, e.g.,* The Federalist No. 1, at 4 (Hamilton) (defining the common good or "public good" as the "true interests" of the community); *id.*, No. 10, at 57 (Madison) ("the permanent and aggregate interests of the community"). For government to promote the common good, it had to do more than simply obey the will of the majority. See, *e.g.*, *ibid.* (discussing majoritarian factions). Government must also protect fundamental rights. See The Declaration of Independence ¶2; 1 W. Blackstone, Commentaries *124 ("[T]he principal aim of society is to protect individuals in the enjoyment of those absolute rights, which are vested in them by the immutable laws of nature").

Of particular concern for the Framers was the majority of people violating the property rights of the minority. Madison observed that "the most common and durable source of factions, has been the various and unequal distribution of property." The Federalist No. 10, at 59. A poignant example occurred in Massachusetts. In what became known as Shays' Rebellion, armed debtors attempted to block legal actions by creditors to recover debts. Although that rebellion was ultimately put down, debtors sought relief from state legislatures "under the auspices of Constitutional forms." Letter from James Madison to Thomas Jefferson (Apr. 23, 1787), in 11 The Papers of Thomas Jefferson 307 (J. Boyd ed. 1955); see Wood 412–413. With no structural political checks on democratic lawmaking, creditors found their rights jeopardized by state laws relieving debtors of their obligation to pay and authorizing forms of payment that devalued the contracts. McConnell, Contract Rights and Property Rights: A Case Study in the Relationship Between Individual Liberties and Constitutional Structures, 76 Cal. L. Rev. 267, 280–281 (1988); see also *Fletcher* v. *Peck*, 6 Cranch 87, 137–138 (1810) (Marshall, C. J.) (explaining that the Contract Clause came from the Framers' desire to "shield themselves and their property from the effects of those sudden and strong passions to which men are exposed").

Because of the Framers' concerns about placing unchecked power in political majorities, the Constitution's majoritarian provisions were only part of a complex republican structure. The Framers also placed several antidemocratic provisions in the Constitution. The original Constitution permitted only the direct election of representatives. Art. I, §2, cl. 1. Senators and the President were selected indirectly. See Art. I, §3, cl. 1; Art. II, §1, cls. 2–3. And the "Great Compromise" guaranteed large and small States voting equality in the Senate. By

malapportioning the Senate, the Framers prevented large States from outvoting small States to adopt policies that would advance the large States' interests at the expense of the small States. See The Federalist No. 62, at 417 (Madison).

These countermajoritarian measures reflect the Framers' aspirations of promoting competing goals. Rejecting a hereditary class system, they thought political power resided with the people. At the same time, they sought to check majority rule to promote the common good and mitigate threats to fundamental rights.

## B

As the Framers understood, designing a government to fulfill the conflicting tasks of respecting the fundamental equality of persons while promoting the common good requires making incommensurable tradeoffs. For this reason, they did not attempt to restrict the States to one form of government.

Instead, the Constitution broadly required that the States maintain a "Republican Form of Government." Art. IV, §4. But the Framers otherwise left it to States to make tradeoffs and reconcile the competing goals.

Republican governments promote the common good by placing power in the hands of the people, while curtailing the majority's ability to invade the minority's fundamental rights. The Framers recognized that there is no universal formula for accomplishing these goals. At the framing, many state legislatures were bicameral, often reflecting multiple theories of representation. Only "[s]ix of the original thirteen states based representation in both houses of their state legislatures on population." Hayden, The False Promise of One Person, One Vote, 102 Mich. L. Rev. 213, 218 (2003). In most States, it was common to base representation, at least in part, on the State's political subdivisions, even if those subdivisions varied heavily in

their populations. Wood 171; *Baker*, 369 U. S., at 307–308 (Frankfurter, J., dissenting).

Reflecting this history, the Constitution continued to afford States significant leeway in structuring their "Republican" governments. At the framing, "republican" referred to "[p]lacing the government in the people," and a "republick" was a "state in which the power is lodged in more than one." S. Johnson, A Dictionary of the English Language (7th ed. 1785); see also The Federalist No. 39, at 251 (Madison) ("[W]e may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people; and is administered by persons holding their offices during pleasure, for a limited period, or during good behaviour"). By requiring the States to have republican governments, the Constitution prohibited them from having monarchies and aristocracies. See *id.*, No. 43, at 291. Some would argue that the Constitution also prohibited States from adopting direct democracies. Compare Wood 222–226 ("For most constitution-makers in 1776, republicanism was not equated with democracy") with A. Amar, America's Constitution: A Biography 276–281 (2005) (arguing that the provision prohibited monarchies and aristocracies but not direct democracy); see also The Federalist No. 10, at 62 (Madison) (distinguishing a "democracy" and a "republic"); *id.*, No. 14, at 83–84 (same).

Beyond that, however, the Constitution left matters open for the people of the States to decide. The Constitution says nothing about what type of republican government the States must follow. When the Framers wanted to deny powers to state governments, they did so explicitly. See, *e.g.*, Art. I, §10, cl. 1 ("No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts").

None of the Reconstruction Amendments changed the original understanding of republican government. Those

Amendments brought blacks within the existing American political community. The Fourteenth Amendment pressured States to adopt universal male suffrage by reducing a noncomplying State's representation in Congress. Amdt. 14, §2. And the Fifteenth Amendment prohibited restricting the right of suffrage based on race. Amdt. 15, §1. That is as far as those Amendments went. As Justice Harlan explained in *Reynolds*, neither Amendment provides a theory of how much "weight" a vote must receive, nor do they require a State to apportion both Houses of their legislature solely on a population basis. See 377 U. S., at 595–608 (dissenting opinion). And JUSTICE ALITO quite convincingly demonstrates why the majority errs by reading a theory of equal representation into the apportionment provision in §2 of the Fourteenth Amendment. See *post*, at 8–13 (opinion concurring in judgment).

C

The Court's attempt to impose its political theory upon the States has produced a morass of problems. These problems are antithetical to the values that the Framers embraced in the Constitution. These problems confirm that the Court has been wrong to entangle itself with the political process.

*First*, in embracing one person, one vote, the Court has arrogated to the Judiciary important value judgments that the Constitution reserves to the people. In *Reynolds*, for example, the Court proclaimed that "[l]egislators represent people, not trees or acres"; that "[l]egislators are elected by voters, not farms or cities or economic interests"; and that, accordingly, electoral districts must have roughly equal population. 377 U. S., at 562–563. As I have explained, the Constitution permits, but does not impose, this view. Beyond that, *Reynolds*' assertions are driven by the belief that there is a single, correct answer to the question of how much voting strength an individual

citizen should have. These assertions overlook that, to control factions that would legislate against the common good, individual voting strength must sometimes yield to countermajoritarian checks. And this principle has no less force within States than it has for the federal system. See The Federalist No. 10, at 63–65 (Madison) (recognizing that smaller republics, such as the individual States, are more prone to capture by special interests). Instead of large States versus small States, those interests may pit urban areas versus rural, manufacturing versus agriculture, or those with property versus those without. Cf. *Reynolds*, *supra*, at 622–623 (Harlan, J., dissenting). There is no single method of reconciling these competing interests. And it is not the role of this Court to calibrate democracy in the vain search for an optimum solution.

The Government argues that apportioning legislators by any metric other than total population "risks rendering residents of this country who are ineligible, unwilling, or unable to vote as invisible or irrelevant to our system of representative democracy." Brief for United States as *Amicus Curiae* 27. But that argument rests on the faulty premise that "our system of representative democracy" requires specific groups to have representation in a specific manner. As I have explained, the Constitution does not impose that requirement. See Parts II–A, II–B, *supra*. And as the Court recently reminded us, States are free to serve as "'laboratories'" of democracy. *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. ____, ____ (2015) (slip op., at 28). That "laboratory" extends to experimenting about the nature of democracy itself.

*Second*, the Court's efforts to monitor the political process have failed to provide any consistent guidance for the States. Even if it were justifiable for this Court to enforce some principle of majority rule, it has been unable to do so in a principled manner. Our precedents do not address

the myriad other ways that minorities (or fleeting majori-
ties) entrench themselves in the political system. States
can place policy choices in their constitutions or have
supermajoritarian voting rules in a legislative assembly.
See, *e.g.,* N. Y. Const., Art. V, §7 (constitutionalizing pub-
lic employee pensions); Ill. Const., Art. VII, §6(g) (requir-
ing a three-fifths vote of the General Assembly to pre-
empt certain local ordinances). In theory, of course, it
does not seem to make a difference if a state legislature is
unresponsive to the majority of residents because the state
assembly requires a 60% vote to pass a bill or because 40%
of the population elects 51% of the representatives.

So far as the Constitution is concerned, there is no
single "correct" way to design a republican government.
Any republic will have to reconcile giving power to the
people with diminishing the influence of special interests.
The wisdom of the Framers was that they recognized this
dilemma and left it to the people to resolve. In trying to
impose its own theory of democracy, the Court is hope-
lessly adrift amid political theory and interest-group
politics with no guiding legal principles.

## III

This case illustrates the confusion that our cases have
wrought. The parties and the Government offer three
positions on what this Court's one-person, one-vote cases
require States to equalize. Under appellants' view, the
Fourteenth Amendment protects the right to an equal
vote. Brief for Appellants 26. Appellees, in contrast,
argue that the Fourteenth Amendment protects against
invidious discrimination; in their view, no such discrimi-
nation occurs when States have a rational basis for the
population base that they select, even if that base leaves
eligible voters malapportioned. Brief for Appellees 16–17.
And, the Solicitor General suggests that reapportionment
by total population is the only permissible standard be-

cause *Reynolds* recognized a right of "equal representation for equal numbers of people." Brief for United States as *Amicus Curiae* 17.

Although the majority does not choose among these theories, it necessarily denies that the Equal Protection Clause protects the right to cast an equally weighted ballot. To prevail, appellants do not have to deny the importance of equal representation. Because States can equalize both total population and total voting power within the districts, they have to show only that the right to cast an equally weighted vote is part of the one-person, one-vote right that we have recognized. But the majority declines to find such a right in the Equal Protection Clause. *Ante,* at 18–19. Rather, the majority acknowledges that "[f]or every sentence appellants quote from the Court's opinions [establishing a right to an equal vote], one could respond with a line casting the one-person, one-vote guarantee in terms of equality of representation, not voter equality." *Ante*, at 16. Because our precedents are not consistent with appellants' position—that the only constitutionally available choice for States is to allocate districts to equalize eligible voters—the majority concludes that appellants' challenge fails. *Ante*, at 15–19.

I agree with the majority's ultimate disposition of this case. As far as the original understanding of the Constitution is concerned, a State has wide latitude in selecting its population base for apportionment. See Part II–B, *supra.* It can use total population, eligible voters, or any other nondiscriminatory voter base. *Ibid.* And States with a bicameral legislature can have some mixture of these theories, such as one population base for its lower house and another for its upper chamber. *Ibid.*

Our precedents do not compel a contrary conclusion. Appellants are correct that this Court's precedents have primarily based its one-person, one-vote jurisprudence on the theory that eligible voters have a right against vote

dilution. *E.g.*, *Hadley*, 397 U. S., at 52–53; *Reynolds*, 377 U. S., at 568. But this Court's jurisprudence has vacillated too much for me to conclude that the Court's precedents preclude States from allocating districts based on total population instead. See *Burns*, 384 U. S., at 92 (recognizing that States may choose other nondiscriminatory population bases). Under these circumstances, the choice is best left for the people of the States to decide for themselves how they should apportion their legislature.

\*    \*    \*

There is no single "correct" method of apportioning state legislatures. And the Constitution did not make this Court "a centralized politburo appointed for life to dictate to the provinces the 'correct' theories of democratic representation, [or] the 'best' electoral systems for securing truly 'representative' government." *Holder* v. *Hall*, 512 U. S. 874, 913 (1994) (THOMAS, J., concurring in judgment). Because the majority continues that misguided search, I concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–940

_____

## SUE EVENWEL, ET AL., APPELLANTS *v.* GREG ABBOTT, GOVERNOR OF TEXAS, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS

[April 4, 2016]

JUSTICE ALITO, with whom JUSTICE THOMAS joins except as to Part III–B, concurring in the judgment.

The question that the Court must decide in this case is whether Texas violated the "one-person, one-vote" principle established in *Reynolds* v. *Sims*, 377 U. S. 533 (1964), by adopting a legislative redistricting plan that provides for districts that are roughly equal in total population. Appellants contend that Texas was required to create districts that are equal in the number of eligible voters, but I agree with the Court that Texas' use of total population did not violate the one-person, one-vote rule.

I

Both practical considerations and precedent support the conclusion that the use of total population is consistent with the one-person, one-vote rule. The decennial census required by the Constitution tallies total population. Art. I, §2, cl. 3; Amdt. 14, §2. These statistics are more reliable and less subject to manipulation and dispute than statistics concerning eligible voters. Since *Reynolds*, States have almost uniformly used total population in attempting to create legislative districts that are equal in size. And with one notable exception, *Burns* v. *Richardson*, 384 U. S. 73 (1966), this Court's post-*Reynolds* cases have likewise looked to total population. Moreover, much

of the time, creating districts that are equal in total population also results in the creation of districts that are at least roughly equal in eligible voters. I therefore agree that States are permitted to use total population in redistricting plans.

## II

Although this conclusion is sufficient to decide the case before us, Texas asks us to go further and to hold that States, while generally free to use total population statistics, are not barred from using eligible voter statistics. Texas points to *Burns*, in which this Court held that Hawaii did not violate the one-person, one-vote principle by adopting a plan that sought to equalize the number of registered voters in each district.

Disagreeing with Texas, the Solicitor General dismisses *Burns* as an anomaly and argues that the use of total population is constitutionally required. The Solicitor General contends that the one-person, one-vote rule means that all persons, whether or not they are eligible to vote, are entitled to equal representation in the legislature. Accordingly, he argues, legislative districts must be equal in total population even if that results in districts that are grossly unequal in the number of eligible voters, a situation that is most likely to arise where aliens are disproportionately concentrated in some parts of a State.

This argument, like that advanced by appellants, implicates very difficult theoretical and empirical questions about the nature of representation. For centuries, political theorists have debated the proper role of representatives,[1] and political scientists have studied the conduct of

---

[1] See, *e.g.*, H. Pitkin, The Concept of Representation 4 (1967) ("[D]iscussions of representation are marked by long-standing, persistent controversies which seem to defy solution"); *ibid.* ("Another vexing and seemingly endless controversy concerns the proper relation between representative and constituents"); Political Representation i (I.

legislators and the interests that they actually advance.[2] We have no need to wade into these waters in this case, and I would not do so. Whether a State is permitted to use some measure other than total population is an important and sensitive question that we can consider if and when we have before us a state districting plan that, unlike the current Texas plan, uses something other than total population as the basis for equalizing the size of districts.

—————

Shapiro, S. Stokes, E. Wood, & A. Kirshner eds. 2009) ("[R]elations between the democratic ideal and the everyday practice of political representation have never been well defined and remain the subject of vigorous debate among historians, political theorists, lawyers, and citizens"); *id.,* at 12 ("[W]e need a better understanding of these complex relations in their multifarious parts before aspiring to develop any general theory of representation"); S. Dovi, Political Representation, The Stanford Encyclopedia of Philosophy (E. Zalta ed. Spring 2014) ("[O]ur common understanding of political representation is one that contains different, and conflicting, conceptions of how political representatives should represent and so holds representatives to standards that are mutually incompatible"), online at http://plato.stanford.edu/ archives/spr2014/entries/political-representation (all Internet materials as last visited Mar. 31, 2016); *ibid.* ("[W]hat exactly representatives *do* has been a hotly contested issue").

[2] See, *e.g.,* Andeweg, Roles in Legislatures, in The Oxford Handbook of Legislative Studies 268 (S. Martin, T. Saalfeld, & K. Strøm eds. 2014) (explaining that the social sciences have not "succeeded in distilling [an] unambiguous concept[ion]" of the "role" of a legislator); Introduction, *id.,* at 11 ("Like political science in general, scholars of legislatures approach the topic from different and, at least partially, competing theoretical perspectives"); Diermeier, Formal Models of Legislatures, *id.,* at 50 ("While the formal study of legislative politics has come a long way, much remains to be done"); Best & Vogel, The Sociology of Legislators and Legislatures, *id.,* at 75–76 ("Stable representative democracies are . . . institutional frameworks and informal arrangements which achieve an equilibrium between the competing demands [of constituents and political opponents]. How this situation affects the daily interactions of legislators is largely unknown").

## III

### A

The Court does not purport to decide whether a State may base a districting plan on something other than total population, but the Court, picking up a key component of the Solicitor General's argument, suggests that the use of total population is supported by the Constitution's formula for allocating seats in the House of Representatives among the States. Because House seats are allocated based on total population, the Solicitor General argues, the one-person, one-vote principle requires districts that are equal in total population. I write separately primarily because I cannot endorse this meretricious argument.

First, the allocation of congressional representation sheds little light on the question presented by the Solicitor General's argument because that allocation plainly violates one person, one vote.[3] This is obviously true with respect to the Senate: Although all States have equal representation in the Senate, the most populous State (California) has 66 times as many people as the least populous (Wyoming). See United States Census 2010, Resident Population Data, http://www.census.gov/ 2010census/data/apportionment-pop-text.php. And even the allocation of House seats does not comport with one person, one vote. Every State is entitled to at least one seat in the House, even if the State's population is lower than the average population of House districts nationwide. U. S. Const., Art. I, §2, cl. 3. Today, North Dakota, Ver-

––––––––––

[3] As JUSTICE THOMAS notes, *ante,* at 8–10 (opinion concurring in judgment), the plan for the House of Representatives was based in large part on the view that there should be "equality of representation," but that does not answer the question whether it is eligible voters (as appellants urge), all citizens, or all residents who should be equally represented. The Constitution allocates House seats based on total inhabitants, but as I explain, the dominant, if not exclusive, reason for that choice was the allocation of political power among the States.

mont, and Wyoming all fall into that category. See United States Census 2010, Apportionment Data, http://www.census. gov/2010census/data/apportionment-data-text.php. If one person, one vote applied to allocation of House seats among States, I very much doubt the Court would uphold a plan where one Representative represents fewer than 570,000 people in Wyoming but nearly a million people next door in Montana.[4]

Second, *Reynolds* v. *Sims* squarely rejected the argument that the Constitution's allocation of congressional representation establishes the test for the constitutionality of a state legislative districting plan. Under one Alabama districting plan before the Court in that case, seats in the State Senate were allocated by county, much as seats in the United States Senate are allocated by State. (At that time, the upper houses in most state legislatures were similar in this respect.) The *Reynolds* Court noted that "[t]he system of representation in the two Houses of the Federal Congress" was "conceived out of compromise and concession indispensable to the establishment of our federal republic." 377 U. S., at 574. Rejecting Alabama's argument that this system supported the constitutionality of the State's apportionment of senate seats, the Court concluded that "the Founding Fathers clearly had no intention of establishing a pattern or model for the apportionment of seats in state legislatures when the system of representation in the Federal Congress was adopted." *Id.*,

---

[4] The Court brushes off the original Constitution's allocation of congressional representation by narrowing in on the Fourteenth Amendment's ratification debates. *Ante*, at 13, n. 10. But those debates were held in the shadow of that original allocation. And what Congress decided to do after those debates was to retain the original apportionment formula—minus the infamous three-fifths clause—and attach a penalty to the disenfranchisement of eligible voters. In short, the Fourteenth Amendment made no structural changes to apportionment that bear on the one-person, one-vote rule.

at 573; see also *Gray* v. *Sanders*, 372 U. S. 368, 378 (1963).

Third, as the *Reynolds* Court recognized, reliance on the Constitution's allocation of congressional representation is profoundly ahistorical. When the formula for allocating House seats was first devised in 1787 and reconsidered at the time of the adoption of the Fourteenth Amendment in 1868, the overwhelming concern was far removed from any abstract theory about the nature of representation. Instead, the dominant consideration was the distribution of political power among the States.

The original Constitution's allocation of House seats involved what the *Reynolds* Court rather delicately termed "compromise and concession." 377 U. S., at 574. Seats were apportioned among the States "according to their respective Numbers," and these "Numbers" were "determined by adding to the whole Number of free Persons . . . three fifths of all other Persons." Art. I, §2, cl. 3. The phrase "all other Persons" was a euphemism for slaves. Delegates to the Constitutional Convention from the slave States insisted on this infamous clause as a condition of their support for the Constitution, and the clause gave the slave States more power in the House and in the electoral college than they would have enjoyed if only free persons had been counted.[5] These slave-state delegates did not

_____

[5] See A. Amar, America's Constitution: A Biography 87–98 (2005) (Amar); *id.,* at 94 ("The best justification for the three-fifths clause sounded in neither republican principle nor Revolutionary ideology, but raw politics"); see also *id.*, at 88–89 (explaining that the "protective coloring" camouflaging the slave States' power grab "would have been wasted had the Constitution pegged apportionment to the number of voters, with a glaringly inconsistent add-on for nonvoting slaves"); cf. G. Van Cleve, A Slaveholders' Union 126 (2010) ("[T]he slave states saw slave representation as a direct political protection for wealth consisting of slave property against possible Northern attacks on slavery, and told the Convention unequivocally that they needed such protection in order to obtain ratification of the Constitution"); *id.,* at 133–134 ("The compromise on representation awarded disproportionate shares of

demand slave representation based on some philosophical notion that "representatives serve all residents, not just those eligible or registered to vote." *Ante,* at 18.[6]

## B

The Court's account of the original Constitution's allocation also plucks out of context Alexander Hamilton's statement on apportionment. The Court characterizes Hamilton's words (more precisely, Robert Yates's summary of his fellow New Yorker's words) as endorsing apportionment by *total* population, and positions those words as if Hamilton were talking about apportionment in the House. *Ante,* at 9. Neither is entirely accurate. The "quote" comes from the controversy over Senate apportionment, where the debate turned on whether to apportion by population *at all.* See generally 1 Records of the Federal Convention of 1787, pp. 470–474 (M. Farrand ed. 1911). Hamilton argued in favor of allocating Senate seats by population:

> "The question, after all is, is it our interest in modifying this general government to sacrifice individual rights to the preservation of the rights of an *artificial* being, called states? There can be no truer principle than this—that every individual of the community at large has an equal right to the protection of government. If therefore three states contain a majority of the inhabitants of America, ought they to be governed by a minority? Would the inhabitants of the great states ever submit to this? If the smaller states main-

---

representative influence to certain vested political-economy interests, one of which was the slave labor economies").

[6] See Amar 92 ("But masters did not as a rule claim to virtually represent the best interests of their slaves. Masters, after all, claimed the right to maim and sell slaves at will, and to doom their yet unborn posterity to perpetual bondage. If this could count as virtual representation, anything could").

tain this principle, through a love of power, will not
the larger, from the same motives, be equally tena-
cious to preserve their power?" *Id.,* at 473.

As is clear from the passage just quoted, Hamilton (ac-
cording to Yates) thought the fight over apportionment
was about naked *power*, not some lofty ideal about the
nature of representation. That interpretation is confirmed
by James Madison's summary of the same statement by
Hamilton: "The truth is it [meaning the debate over appor-
tionment] is a contest for power, not for liberty. . . . The
State of Delaware having 40,000 souls will *lose power*, if
she has ¹/₁₀ only of the votes allowed to Pa. having
400,000." *Id.,* at 466. Far from "[e]ndorsing apportion-
ment based on total population," *ante,* at 9, Hamilton was
merely acknowledging the obvious: that apportionment in
the new National Government would be the outcome of a
contest over raw political power, not abstract political
theory.

C

After the Civil War, when the Fourteenth Amendment
was being drafted, the question of the apportionment
formula arose again. Thaddeus Stevens, a leader of the
so-called radical Republicans, unsuccessfully proposed
that apportionment be based on eligible voters, rather
than total population. The opinion of the Court suggests
that the rejection of Stevens' proposal signified the adop-
tion of the theory that representatives are properly under-
stood to represent all of the residents of their districts,
whether or not they are eligible to vote. *Ante*, at 10–12.
As was the case in 1787, however, it was power politics,
not democratic theory, that carried the day.

In making his proposal, Stevens candidly explained that
the proposal's primary aim was to perpetuate the domi-
nance of the Republican Party and the Northern States.
Cong. Globe, 39th Cong., 1st Sess., 74 (1865); Van Alstyne,

The Fourteenth Amendment, The "Right" to Vote, and the Understanding of the Thirty-Ninth Congress, 1965 S. Ct. Rev. 33, 45–47 (Van Alstyne). As Stevens spelled out, if House seats were based on total population, the power of the former slave States would be magnified. Prior to the Civil War, a slave had counted for only three-fifths of a person for purposes of the apportionment of House seats. As a result of the Emancipation Proclamation and the Thirteenth Amendment, the former slaves would now be fully counted even if they were not permitted to vote. By Stevens' calculation, this would give the South 13 additional votes in both the House and the electoral college. Cong. Globe, 39th Cong., 1st Sess., 74 (1865); Van Alstyne 46.

Stevens' proposal met with opposition in the Joint Committee on Reconstruction, including from, as the majority notes, James Blaine. *Ante,* at 11. Yet, as it does with Hamilton's, the majority plucks Blaine's words out of context:

> "[W]e have had several propositions to amend the Federal Constitution with respect to the basis of representation in Congress. These propositions . . . give to the States in future a representation proportioned to their voters instead of their inhabitants.
>
> "The effect contemplated and intended by this change is perfectly well understood, and on all hands frankly avowed. It is to deprive the lately rebellious States of the unfair advantage of a large representation in this House, based on their colored population, so long as that population shall be denied political rights by the legislation of those States. . . .
>
> "The direct object thus aimed at, as it respects the rebellious States, has been so generally approved that little thought seems to have been given to the incidental evils which the proposed constitutional

amendment would inflict on a large portion of the loyal States—evils, in my judgment, so serious and alarming as to lead me to oppose the amendment in any form in which it has yet been presented.  As an abstract proposition no one will deny that population is the true basis of representation; for women, children, and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot. . . .

"If voters instead of population shall be made the basis of representation certain results will follow, not fully appreciated perhaps by some who are now urgent for the change."  Cong. Globe, 39th Cong., 1st Sess., 141 (1865).

The "not fully appreciated" and "incidental evi[ll]" was, in Blaine's view, the disruption to *loyal* States' representation in Congress.  Blaine described how the varying suffrage requirements in loyal States could lead to, for instance, California's being entitled to eight seats in the House and Vermont's being entitled only to three, despite their having similar populations.  *Ibid.*; see also 2 B. Ackerman, We the People: Transformations 164, 455, n. 5 (1998); Van Alstyne 47, 70.  This mattered to Blaine because *both States were loyal* and so neither deserved to suffer a loss of relative political power.  Blaine therefore proposed to apportion representatives by the "whole number of persons except those to whom civil or political rights or privileges are denied or abridged by the constitution or laws of any State on account of race or color."  Cong. Globe, 39th Cong., 1st Sess., 142.

"This is a very simple and very direct way, it seems to me, of reaching the result aimed at without embarrassment to any other question or interest.  It leaves population as heretofore the basis of representation, does not disturb in any manner the harmonious rela-

tions of the loyal States, and it conclusively deprives the southern States of all representation in Congress on account of the colored population so long as those States may choose to abridge or deny to that population the political rights and privileges accorded to others." *Ibid.*

As should be obvious from these lengthy passages, Blaine recognized that the "generally approved" "result aimed at" was to deprive southern States of political power; far from quibbling with that aim, he sought to *achieve it* while limiting the collateral damage to the loyal northern States. See Van Alstyne 47.

Roscoe Conkling, whom the majority also quotes, *ante,* at 11, seemed to be as concerned with voter-based apportionment's "narrow[ing] the basis of taxation, and in some States seriously," as he was with abstract notions of representational equality. Cong. Globe, 39th Cong., 1st Sess., 358; *id.,* at 359 ("representation should go with taxation"); *ibid.* (apportionment by citizenship "would narrow the basis of taxation and cause considerable inequalities in this respect, because the number of aliens in some States is very large, and growing larger now, when emigrants reach our shores at the rate of more than a State a year"). And Hamilton Ward, also quoted by the majority, *ante,* at 11, was primarily disturbed by "[t]he fact that one South Carolinian, whose hands are red with the blood of fallen patriots, and whose skirts are reeking with the odors of Columbia and Andersonville, will have a voice as potential in these Halls as two and a half Vermont soldiers who have come back from the grandest battle-fields in history maimed and scarred in the contest with South Carolina traitors in their efforts to destroy this Government"—and only secondarily worried about the prospect of "taxation without representation." Cong. Globe, 39th Cong., 1st Sess., 434.

Even Jacob Howard, he of the "theory of the Constitution" language, *ante,* at 12, bemoaned the fact that basing representation on total population would allow southern States "to obtain an advantage which they did not possess before the rebellion and emancipation." Cong. Globe, 39th Cong., 1st Sess., 2766. "I object to this. I think they cannot very consistently call upon us to grant them an additional number of Representatives simply because in consequence of their own misconduct they have lost the property [meaning slaves, whom slaveholders considered to be property] which they once possessed, and which served as a basis in great part of their representation." *Ibid.* The list could go on. The bottom line is that in the leadup to the Fourteenth Amendment, claims about representational equality were invoked, if at all, only in service of the *real* goal: preventing southern States from acquiring too much power in the National Government.

After much debate, Congress eventually settled on the compromise that now appears in §2 of the Fourteenth Amendment. Under that provision, House seats are apportioned based on total population, but if a State wrongfully denies the right to vote to a certain percentage of its population, its representation is supposed to be reduced proportionally.[7] Enforcement of this remedy, however, is

---

[7] Section 2 provides:

"Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

dependent on action by Congress, and—regrettably—the remedy was never used during the long period when voting rights were widely abridged. Amar 399.

In light of the history of Article I, §2, of the original Constitution and §2 of the Fourteenth Amendment, it is clear that the apportionment of seats in the House of Representatives was based in substantial part on the distribution of political power among the States and not merely on some theory regarding the proper nature of representation. It is impossible to draw any clear constitutional command from this complex history.

\*　　\*　　\*

For these reasons, I would hold only that Texas permissibly used total population in drawing the challenged legislative districts. I therefore concur in the judgment of the Court.

---

Needless to say, the reference in this provision to "male inhabitants . . . being twenty-one years of age" has been superseded by the Nineteenth and Twenty-sixth Amendments. But notably the reduction in representation is pegged to the proportion of (then) *eligible voters* denied suffrage. Section 2's representation-reduction provision makes no appearance in the Court's structural analysis.