OSCN Found Document:IN RE: INITIATIVE PETITION No. 426 STATE QUESTION No. 810

 

 
 

 
 IN RE: INITIATIVE PETITION No. 426 STATE QUESTION No. 810
2020 OK 43
Case Number: 118685
Decided: 05/27/2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 43, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

IN RE: INITIATIVE PETITION No. 426, STATE QUESTION No. 810 MARC MCCORMICK, LAURA NEWBERRY, ROGER GADDIS, and, CLAIRE ROBINSON DAVEY, Protestants/Petitioners,
v.
ANDREW MOORE, JANET ANN LARGENT and LYNDA JOHNSON, Respondents/Proponents.

ORIGINAL PROCEEDING TO DETERMINE THE CONSTITUTIONAL VALIDITY OF INITIATIVE PETITION NO. 426, STATE QUESTION NO. 810

Â¶0 This is an original proceeding to determine the legal sufficiency of Initiative Petition No. 426, State Question No. 810. The petition seeks to create a new article to the Oklahoma Constitution, Article V-A, for the purpose of establishing the Citizens' Independent Redistricting Commission. The Petitioners filed this protest alleging the petition is unconstitutional because it violates Article 1, Â§2, the Equal Protection Clause and the First Amendment of the United States Constitution. Upon our review, we hold the Petitioners have not met their burden to show Initiative Petition No. 426 contains clear or manifest facial constitutional infirmities. On the grounds alleged, the petition is legally sufficient for submission to the people of Oklahoma.

INITIATIVE PETITION NO. 426, STATE QUESTION NO. 810 IS
LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF
OKLAHOMA

Robert G. McCampbell and Travis V. Jett, GableGotwals, Oklahoma City, Oklahoma, for Petitioners.

D. Kent Meyers, and Melanie Wilson Rughani, Crowe & Dunlevy, Oklahoma City, OK, for Respondents.

COMBS, J.:

I. FACTS AND PROCEDURAL HISTORY

Â¶1 On October 28, 2019, the Respondents/Proponents, Andrew Moore, Janet Ann Largent, and Lynda Johnson (Respondents), filed Initiative Petition No. 420, State Question No. 804 (IP 420), with the Secretary of State of Oklahoma. The initiative measure proposed for submission to the voters the creation of a new constitutional article, Article V-A, which would create the Citizens' Independent Redistricting Commission (Commission). IP 420 would vest the power to redistrict the State's House of Representatives and Senatorial districts, as well as Federal Congressional Districts, in this newly created Commission. IP 420 was challenged in two separate cases; In re Initiative Petition No. 420, State Question No. 804, 2020 OK 9, 458 P.3d 1088 and In re Initiative Petition No. 420, State Question No. 804, 2020 OK 10, 458 P.3d 1080. On February 4, 2020, this Court handed down its decisions in both matters. We held in 2020 OK 9 that IP 420 did not violate the single subject rule and we would not address the First Amendment issues due to uncertainty in federal jurisprudence, i.e., IP 420 did not clearly or manifestly violate the First Amendment. We found the initiative petition was legally sufficient but did note it was troubling that the proposed opinion would prohibit a person from serving as a commissioner if they changed their party affiliation within the last four years preceding the appointment because this provision would apply a retroactive restriction "well prior to the enactment." In re Initiative Petition No. 420, State Question No. 804, 2020 OK 9, Â¶33 n.17, 458 P.3d 1088. In the related opinion, we held the gist was insufficient and declared IP 420 invalid because it did not describe the true nature of the initiative petition which was "to curtail partisan gerrymandering" in the redistricting process. In re Initiative Petition No. 420, State Question No. 804, 2020 OK 10, Â¶7, 458 P.3d 1080.

Â¶2 Two days later, February 6, 2020, the proponents of IP 420 filed a new initiative petition (Initiative Petition No. 426, State Question 810). The Secretary of State published the required notice of the initiative petition on February 13, 2020. Initiative Petition No. 426 (IP 426) is nearly identical to IP 420. It creates a new constitutional article, Article V-A, which would create the Citizens' Independent Redistricting Commission (Commission). Like IP 420, it would vest the power to redistrict the State's House of Representatives and Senatorial districts, as well as Federal Congressional Districts, in this newly created Commission. Initiative Petition No. 426, like IP 420, requires the Commission's Secretary to gather information from the Department of Corrections about the home address of state and federal inmates and add this information to the Federal Decennial Census data so that incarcerated people can be counted in their home communities rather than place of incarceration. Sections 4(C)(2)(e) and 4(C)(3)(a) of IP 426. The provisions in IP 426 concerning the qualifications to be a commissioner differ from those in IP 420 and, arguably, are less restrictive than those found in IP 420. Section 4(B)(2)(a-f) of IP 426 provides for the qualifications of a commissioner. A member of the Commission shall have been continuously domiciled in this State for the five years immediately preceding the date of appointment and shall not have changed their registered political affiliation in the four years immediately preceding the date of appointment or since the date the initiative petition was filed (February 6, 2020), whichever period is shorter.[1] In addition, in the five years immediately preceding the date of appointment to the Commission, the commissioner shall not: 1) have held, or have an immediate family member who has held, a partisan elective office at the federal, state or political subdivision level in this State,[2] 2) have registered, or have an immediate family member who has registered, as a lobbyist with the Federal Government or the State of Oklahoma,[3] 3) have held office or served as a paid staff member of a political party, or have an immediate family member who has held office or served as a paid staff member of a political party,[4] have been nominated, nor have an immediate family member who has been nominated, as a candidate for elective office by a political party in this State,[5] have been an employee or paid consultant of the Oklahoma State Legislature or U.S. Congress, or have any immediate family members who have been an employee or paid consultant of the Oklahoma State Legislature or U.S. Congress.[6] The definition of "immediate family member" is less restrictive in IP 426. It provides that the term shall "refer to, with respect to an individual, a spouse, parent, sibling, or child (including step-parent, step-sibling, or step-child)." Section 4(A)(9) of IP 426. Initiative Petition No. 420 had also included "father-in-law, or mother-in-law" which is not part of IP 426's definition.

Â¶3 On February 28, 2020, the Protestants/Petitioners, Marc McCormick, Laura Newberry, Roger Gaddis, and Claire Robinson Davey filed their challenge to IP 426 pursuant to 34 O.S. Â§ 8 (B). First, the Petitioners claim reallocation of prisoners to their home addresses for purposes of redistricting does not achieve population equality, is arbitrary, unsystematic, and would violate Article I, Â§ 2 of the United States Constitution. In addition, not counting all "group quarters" identified in the Federal Decennial Census, such as, college students, nursing home residents, and residents of mental health facilities the same as prisoners would violate the Equal Protection Clause of the United States Constitution. Petitioners also challenge the constitutionality of provisions in IP 426 that place restrictions on who can be a commissioner.

II. STANDARD OF REVIEW 

Â¶4 "The first power reserved by the people is the initiative...." Okla. Const. art. 5, Â§ 2; In re Initiative Petition No. 409, State Question No. 785, 2016 OK 51, Â¶2, 376 P.3d 250; In re Initiative Petition No. 403, State Question No. 779, 2016 OK 1, Â¶3, 367 P.3d 472. With that reservation comes "the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." Okla. Cost. art. 5, Â§ 1; In re Initiative Petition No. 409, 2016 OK 51, Â¶2; In re Initiative Petition No. 403, 2016 OK 1, Â¶3. "The right of the initiative is precious, and it is one which this Court is zealous to preserve to the fullest measure of the spirit and the letter of the law." In re Initiative Petition No. 382, State Question No. 729, 2006 OK 45, Â¶3, 142 P.3d 400. See In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, Â¶35, 838 P.2d 1. We have repeatedly emphasized both how vital the right of initiative is to the people of Oklahoma, as well as the degree to which we must protect it:

Because the right of the initiative is so precious, all doubt as to the construction of pertinent provisions is resolved in favor of the initiative. The initiative power should not be crippled, avoided, or denied by technical construction by the courts.

In re Initiative Petition No. 403, 2016 OK 1, Â¶3 (quoting In re Initiative Petition No. 382, 2006 OK 45, Â¶3).

Â¶5 However, while the fundamental and precious right of initiative petition is zealously protected by this Court, it is not absolute. Any citizen can protest the sufficiency and legality of an initiative petition. In re Initiative Petition No. 409, 2016 OK 51, Â¶2; In re Initiative Petition No. 384, State Question No. 731, 2007 OK 48, Â¶2, 164 P.3d 125. "Upon such protest, this Court must review the petition to ensure that it complies with the 'parameters of the rights and restrictions [as] established by the Oklahoma Constitution, legislative enactments and this Court's jurisprudence.'" In re Initiative Petition No. 384, 2007 OK 48, Â¶2 (quoting In re Initiative Petition No. 379, State Question No. 726, 2006 OK 89, Â¶16, 155 P.3d 32).

Â¶6 As to challenged initiative provisions, this Court has consistently confined our pre-election review under Section 8 of Title 34 of the Oklahoma Statutes to "clear or manifest facial constitutional infirmities." In re Initiative Petition No. 358, State Question No. 658, 1994 OK 27, Â¶7, 870 P.2d 782. Accordingly, the Petitioners in this matter bear the burden of demonstrating the proposed initiative petition contains clear or manifest facial constitutional infirmities. See In re Initiative Petition No. 403, 2016 OK 1, Â¶3; In re Initiative Petition No. 362, State Question No. 669, 1995 OK 77, Â¶12, 899 P.2d 1145.

III. ANALYSIS

A. Reallocation of inmates to their home address is not clearly or manifestly unconstitutional. 

Â¶7 The Petitioners argue reallocation of prisoners to their home addresses for purposes of redistricting does not achieve population equality, is arbitrary and unsystematic, and would violate both Article I, Â§ 2 of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment. They assert the United States Census Bureau counts prisoners in the decennial census at the place where they are incarcerated and they interpret opinions of the United States Supreme Court to prohibit adjusting this data.[7] IP 426 will count inmates for redistricting purposes at their last home address rather than where they are incarcerated. The redistricting scheme under IP 426 includes both congressional districts and state legislative districts. The Petitioners claims are based on alleged malapportionment. Two distinct personal interests are negatively impacted by malapportionment. The first is electoral equality, i.e., the interest in having one's vote counted equally with that of others. See Reynolds v. Simms, 377 U.S. 533, 568 (1964) ("an individual's right to vote ... is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living on other parts of the State."); Calvin v. Jefferson Cty. Bd. of Commissioners, 172 F. SupP.3d 1292, 1303-04 (N.D. Fla. 2016). The second is representational equality, the interest in being represented on an equal footing with one's neighbors. See Kirkpatrick v. Preisler, 394 U.S. 526, 531 (1969) ("Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives."); Calvin, 172 F.SupP.3d at 1304.

Â¶8 Supreme Court jurisprudence tolerates much less deviation in population equality for congressional districts than it does for state legislative districts. In Wesberry v. Sanders, the Supreme Court dealt with malapportionment of congressional districts. 376 U.S. 1 (1964). The Court held that while it may not be possible for states to draw congressional districts with mathematical precision, Art. I., Â§ 2 of the United States Constitution requires that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Id. at 7-8, 18. Article I., Â§ 2 provides in relevant part:

The House of Representatives shall be composed of Members chosen every second Year by the People of the several States...Representatives...shall be apportioned among the several States which may be included within this Union, according to their respective Numbers...

It establishes a "high standard of justice and common sense" for the apportionment of congressional districts: "equal representation for equal numbers of people." Id. at 18; Karcher v. Daggett, 462 U.S. 725, 730 (1983). Precise mathematical equality, however, may be impossible to achieve in an imperfect world; therefore, the "equal representation" standard is enforced only to the extent of requiring districts be apportioned to achieve population equality "as nearly as practicable." Wesberry, 376 U.S. at 7-8, 18; Karcher, 462 U.S. at 730. The "as nearly as practicable" standard requires that the State make a good-faith effort to achieve precise mathematical equality. Kirkpatrick v. Preisler, 394 U.S. 526, 530-31 (1969). Therefore, for congressional districts, Art. I., Â§ 2, "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." Id. at 531.

Â¶9 Karcher discusses the two basic questions that shape such litigation over congressional apportionment. First, the court will consider whether the population differences among the congressional districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population. Karcher, 462 U.S. at 730-31. The parties challenging the apportionment legislation must bear the burden of proof on this issue, and if they fail to show that the differences could have been avoided the apportionment scheme must be upheld. Id. However, if the challengers can establish the population differences were not the result of a good-faith effort to achieve equality, the State bears the burden of proving that each significant variance between congressional districts was necessary to achieve some legitimate goal. Id. at 731.

Â¶10 In Karcher, the small deviations between the congressional districts were based on numbers that excluded perceived flaws in the census data. The deviation between the largest district and the smallest district was less than one percent (1.0%), however, the district court determined the redistricting plan was not unavoidable despite a good-faith effort to achieve absolute equality. Karcher, 462 U.S. at 729. It rejected the argument that the deviation was lower than the statistical imprecision of the decennial census and therefore was the functional equivalent of mathematical equality. Id. The Court held there are no de minimis population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I., Â§ 2 without justification. Id. at 734. Absolute population equality is the paramount objective of apportionment only in the case of congressional districts. Id. at 732-33. "[T]he national legislature outweighs the local interests that a State may deem relevant in apportioning districts for representatives to state and local legislatures." Id. at 733. The de minimis line chosen by the appellants was based on the "inevitable statistical imprecision of the census" which gives an illusion of rationality and predictability. Id. at 735. The Court found two problems with this choice. First, it noted, the census systematically undercounts actual population but to what extent is not known. Id. Second, the mere existence of statistical imprecision does not make small deviations among the congressional districts the functional equivalent of equality. Id. The undercounting varies from place to place but the fact there is undercounting does not render meaningless the differences in population between congressional districts as determined by uncorrected census counts. Id. at 738. The census data provides the only reliable, albeit less than perfect, indication of the districts real relative population levels. Id. A district with a larger census count can be said with certainty will be larger than one with a smaller census count and this is sufficient for decision making. Id. Because the census represents the best population data available it is the only basis for good-faith attempts to achieve population equality and attempts to explain population deviations on the basis of flaws in census data must be supported with a precision not achieved here. Id. If a State attempts to use a measure other than total population or to correct the census figures, it may not do so in a haphazard, inconsistent, or conjectural manner. Id. at 732 n.4. The Court affirmed the district court's ruling which held the reapportionment plan was unconstitutional. Id. at 744.

Â¶11 Unlike congressional districts, the basis for preventing the ills of malapportionment on the state and local level is found in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[8] The Supreme Court first held, in Baker v. Carr, that state legislative apportionment challenges were justiciable under the Fourteenth Amendment and would no longer be perceived as non-justiciable political questions. 369 U.S. 186, 237 (1962).[9] When drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality. Evenwel v. Abbot, 136 S.Ct. 1120, 1124 (2016). This may be done to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness. Id. The Court noted the "safe harbor rule" for state and local districts: "[w]here the maximum population deviation between the largest and smallest district is less than 10% the Court has held, a state or local legislative map presumptively complies with the one-person, one-vote rule." Id. Although there have been many disputes over what is a permissible deviation from perfect population equality, there has been much fewer disputes on what population base jurisdictions must equalize. Id. In Burns v. Richardson, the Court acknowledged it had previously held both houses of a bicameral state legislature must be apportioned substantially on a population basis. 384 U.S. 73, 91. However, "the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured." Id. The Court had previously left open the question of what "population" was being referred to. Id. It found its previous decisions did not suggest "the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured." Id. at 92. Evenwel, noted Burns was a rare occasion where a jurisdiction relied upon registered-voters of districts for the basis of its apportionment plan. Evenwel, 136 S.Ct. at 1124. It also found jurisdictions have equalized total population measured by the census in a majority of cases, but seven States had notably adjusted those census numbers in a meaningful way.[10] Id.

Â¶12 The Petitioners allege, for purposes of apportioning both congressional and state legislative districts, the state must use the census data as provided by the United States Census Bureau which counts incarcerated persons at the place where they are incarcerated. Their argument is largely based on the Kirkpatrick and Karcher opinions. They assert using any other address than where the census counts incarcerated persons is arbitrary and would violate Art. I., Â§ 2 of the United States Constitution. However, we disagree with their assertion based upon federal jurisprudence, statements of the Census Bureau, and actions by other states.

Â¶13 In Fletcher v. Lamone, African American residents of Maryland sued state officials challenging the newly implemented apportionment plan. 831 F. SupP.2d 887, 891 (D. Md. 2011), aff'd, 567 U.S. 930 (2012). Several plans had been proposed to create three instead of two largely African American congressional districts. Those proposals did not make it into the final plan which kept the status quo that retained only two largely African American districts. The plaintiffs asserted a malapportionment claim based upon a violation of Art. I., Â§ 2 of the United States Constitution. Id. at 892-93. This claim concerns Maryland's "No Representation Without Population Act." Id. at 893. The Act requires for purposes of drawing local, state, and congressional districts, inmates of state or federal prisons located in Maryland must be counted as residents of their last known residence before incarceration. Id. The Act was created in 2010 to prevent the distortional effects of counting prisoners in predominantly white districts where the prisons are located rather than in African American areas where a majority of prisoners had come from. Id. Prior to the Act, residents of districts where prisons were located were able to elect the same number of representatives despite in reality having comparatively fewer voting-eligible members of the community. Id. An issue that concerns representational equality, i.e., residents of districts with prisons were systematically "overrepresented" compared to other districts. Id.

Â¶14 In analyzing the Art. I., Â§ 2 based claim the court found:

Article I, Â§ 2 provides that the members of the House of Representatives are to be chosen "by the People of the several States." U.S. Const. art. I, Â§ 2. As interpreted by the Supreme Court, this provision mandates that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry v. Sanders, 376 U.S. 1, 7--8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). "[T]he 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality." Kirkpatrick v. Preisler, 394 U.S. 526, 530--31, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). "Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." Id. States do not have unlimited discretion in performing the calculations required to meet the "One Person, One Vote" standard. In Kirkpatrick and again in Karcher v. Daggett, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the Supreme Court concluded that because the census count represents the " 'best population data available,' it is the only basis for good-faith attempts to achieve population equality." Karcher, 462 U.S. at 738, 103 S.Ct. 2653 (internal citation omitted) (quoting Kirkpatrick, 394 U.S. at 528, 89 S.Ct. 1225).

Fletcher, 831 F.SupP.2d at 894. Like the Petitioners in the present case, the plaintiffs in Fletcher relied mainly on the Kirkpatrick and Karcher cases and asserted the only population number that could be used for determining congressional districts was that generated by the Census Bureau and Maryland's decision to adjust this number was unconstitutional. Id. 

Â¶15 The Fletcher court disagreed and found the plaintiffs had not read these cases in their full context. Id. A full reading of these cases show they require a state to use census data as a starting point but they do not hold that a state may not modify this data to correct perceived flaws. Id. Kirkpatrick and Karcher, however, require a state that uses a measure other than total population or to "correct" the census figures must do so in a manner that is not haphazard, inconsistent, or conjectural. Id. The court noted in Karcher the New Jersey redistricting plan at issue was rejected not because the state used adjusted census data, but because it failed to perform its adjustments systematically. Id. The statements in Karcher suggest a "State may choose to adjust the census data, so long as those adjustments are thoroughly documented and applied in a nonarbitrary fashion and they otherwise do not violate the Constitution." Id., at 894-895.

Â¶16 The court also found a majority of courts to consider this issue have similarly concluded Kirkpatrick and Karcher did not bar the use of adjusted census data. Id., at 895. In City of Detroit v. Franklin, the Sixth Circuit held:

The Court in Karcher did not hold that the states must use census figures to reapportion congressional representation. The Supreme Court merely reiterated a well-established rule of constitutional law: states are required to use the "best census data available" or "the best population data available" in their attempts to effect proportionate political representation. Nothing in the constitution or Karcher compels the states or Congress to use only the unadjusted census figures.

4 F.3d. 1367, 1374 (6th Cir. 1993) (quoting City of Detroit v. Franklin, 800 F.Supp. 539, 543 (E.D.Mich.1992)); Id. The court also quoted Senate of State of Cal. v. Mosbacher, wherein the Ninth Circuit stated in dicta "[i]f the State knows that the census data is unrepresentative, it can, and should, utilize noncensus data in addition to the official count in its redistricting process." 968 F.2d 974, 979 (9th Cir.1992); Id. 

Â¶17 Even the United States Census Bureau condones the reallocation of prisoners to other locales. Fletcher found the Census Bureau only counts prisoners at the place of incarceration for pragmatic and administrative reasons, not legal ones. Fletcher, 831 F.SupP.2d at 895. Because of the extensive coordination with correctional facilities and the cost of that process, the Census Bureau was unwilling to undertake the effort to count prisoners at a place other than where they were incarcerated. Id., at 895-96. The court found "[f]or the 2010 census, the Bureau released its population data for prisoners and other inhabitants of 'group quarters' early to enable States to 'leave the prisoners counted where the prisons are, delete them from redistricting formulas, or assign them to some other locale." (quoting So, How Do You Handle Prisons?, Director's Blog, U.S. Census Bureau (March 10, 2010), http://blogs.census.gov/directorsblog/2010/03/so-how-do-you-handle-prisons.html.). The court in Calvin also recognized this. It found that the Census Bureau acknowledges counting prisoners at the place of incarceration could potentially present problems, and that some state and local governments might want to adjust census data to remove or relocate prisoners to their pre-prison residences. Calvin, 172 F.SupP.3d at 1297.

Â¶18 Fletcher, next, ruled on whether the process used in Maryland for the counting of prisoners was systematic, not arbitrary, as demanded by Karcher. Fletcher, 831 F.SupP.2d at 896. The court determined the Maryland Department of Planning (MDP) undertook and documented a multistep process by which it attempted to identify the last known address of all individuals in Maryland's prisons. Id. This information was then used to make the relevant adjustments to the data it received from the Census Bureau. Id. The court found "[t]his process is a far cry from the 'haphazard, inconsistent, or conjectural' alterations the Supreme Court rejected in Karcher." The court in Calvin even suggested that including prisoners in districts only where prisons were located was arbitrary, not the reverse. Calvin, 172 F.SupP.3d. at 1323 ("any population arbitrarily included in a population base, no matter how small, works an unconstitutional dilution of others' rights."). The process for counting prisoners in IP 426 is like the process used by the MDP in Fletcher.[11] 

Â¶19 As mentioned, the United States Supreme Court recognizes that jurisdictions have equalized total population measured by the census in a majority of cases, but seven States had notably adjusted those census numbers in a meaningful way. Evenwel, 136 S.Ct., at 1124. Since Evenwel was decided (2016), at least one state has enacted law requiring census data to be revised in order to count inmates in the block, block group and census tract where they were a resident before incarceration rather than where they are counted in the census (place of incarceration). Assembly Bill No. 450 (AB 450 (2019)) was passed by the Nevada Legislature (composed of the Assembly and the Senate) and was later approved by the Governor on May 29, 2019. Section 6 of AB 450 requires the Director of the Department of Corrections to compile the last known residential address of each offender immediately before they were sentenced to imprisonment in a facility or institution. Section 9 of AB 450 requires the State Demographer to use this information and revise the census data to include those inmates at their prior residence for apportionment purposes. Sections 3 and 7 of AB 450 require the State Demographer to use this revised population count to apportion legislative and congressional districts, respectively.

Â¶20 Next, the Petitioners argue IP 426 singles out one "group quarters" subcategory from the census for different treatment and this "exceeds the discretion allowed to states under the Equal Protection Clause." Petitioners' Brief at 9. Other "group quarters" residents include such categories as college students, persons living in nursing homes or mental hospitals, and military. Petitioners assert adjusting prisoner census data and not adjusting the data for other "group quarters" categories violates the Equal Protection Clause when applied to redistricting the state legislature. Normally, such equal protection claims are based upon electoral equality or representational equality challenges. Here Petitioners seem to be arguing these other "group quarters" categories have a right to be treated identically. However, this argument appears to be a reiteration of their argument that census data cannot be adjusted, which it seems clear from the above discussion, is not correct. Regardless, an equal protection analysis requires strict scrutiny of a legislative classification only when such classification impermissibly interferes with the exercise of a fundamental right, such as, the right to vote, right of interstate travel, rights guaranteed by the First Amendment, or right to procreate, or operates to the peculiar disadvantage of a suspect class, such as, one based upon alienage, race, or ancestry. Hendrick v. Jones, 2013 OK 71, 9, 349 P.3d 531. Unless a classification warrants some form of heightened review, the Equal Protection Clause only requires the classification rationally further a legitimate state interest. Id. This lower threshold is identified as the rational-basis test. Id. Here, we are not dealing with any suspect classes and therefore we use a rational basis test. The Respondents explain that the rational basis for reallocating prisoners to their home community rather than place of incarceration is to prevent "prison gerrymandering" i.e., the systematic transfer of a large non-voting population from urban, disproportionately minority regions to rural, disproportionately white regions of the state where prisons are located. Respondents' Brief at 2-3. This type of gerrymandering "inflates the political power of the area where the prison is located, and deflates the political power in the prisoners' home communities." Id. n.1; Petitioners' App. C at 5527. Such actions could affect the representational equality between prison districts and non-prison districts. In addition, the categories the Census Bureau has defined as "group quarters" are not all similarly situated. Both courts in Fletcher and Calvin recognized the unique differences of prisoners from other populations included in the "group quarters" definition. In Fletcher the court stated:

[P]laintiffs' argument on this point implies that college students, soldiers, and prisoners are all similarly situated groups. This assumption, however, is questionable at best. College students and members of the military are eligible to vote, while incarcerated persons are not. In addition, college students and military personnel have the liberty to interact with members of the surrounding community and to engage fully in civic life. In this sense, both groups have a much more substantial connection to, and effect on, the communities where they reside than do prisoners.

Fletcher, 831 F.SupP.2d at 896. Calvin found that the prisoners were situated differently with respect to the "true denizens" of the county in question "in every way that matters for representative democracy" and "[t]reating them alike makes little if any sense." Calvin, 172 F.SupP.3d at 1323.

Â¶21 We find the Respondents have established a rational basis for correcting any representational equality issues by eliminating "prison gerrymandering" and IP 426 does so by adjusting prisoner census data in a systematic way. The reallocation of prisoners under IP 426 does not clearly or manifestly violate either Article I, Â§ 2 of the United States Constitution or the Equal Protection Clause of the Fourteenth Amendment. Once prisoners are reallocated to their pre-incarceration communities new congressional and state legislative districts can be drawn.[12] How such districts will be drawn and how equal they will be in total population numbers, for congressional districts at least, has not yet occurred and is premature for this Court to consider. Nor do we find any merit in Petitioners' equal protection argument concerning treatment of "group quarters" categories.

B. The restrictions in IP 426 on who can be a commissioner are not clearly or manifestly unconstitutional. 

Â¶22 The Petitioners assert various restrictions on who can be a commissioner in IP 426 are unconstitutional. They raise their First Amendment challenges in the previously mentioned case concerning IP 420 to the provisions in IP 426;[13] specifically, the provision in Section 4(B)(2)(a) of IP 426 which requires a commissioner to not have changed his or her party affiliation in the four years immediately preceding the date of appointment to the Commission or since the date the IP 426 was filed, whichever is shorter. This time, the claim is based upon an equal protection analysis quoting from our opinion in Hendricks v. Jones "[a]n equal protection analysis requires strict scrutiny of a legislative classification only when such classification impermissibly interferes with the exercise of a fundamental right, such as...rights guaranteed by the First Amendment." 2013 OK 71, Â¶9, 349 P.3d 531; See Gladstone v. Bartlesville Independent School Dist. No. 30, 2003 OK 30, Â¶9, 66 P.3d 442. The provision in IP 426, they allege, interferes with the exercise of fundamental First Amendment rights, namely, freedom of association protected by the First and Fourteenth Amendment ("The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom" Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 214 (1986)). Later, in their brief, they also claim the provision violates their First Amendment rights because it is an "unconstitutional condition of employment and denial of government benefit" citing Elrod v. Burns, 427 U.S. 347, 372 (1976).

Â¶23 Petitioners also appear to contend that because 34 O.S. Â§8 was amended in 2009[14] to specifically require this Court to review constitutional claims at this stage of the initiative process we should hear and decide all of their constitutional claims and essentially abandon our jurisprudence of determining only those constitutional claims that show "clear or manifest facial constitutional infirmities." See In re Initiative Petition No. 420, State Question No. 804, 2020 OK 9, Â¶14, 458 P.3d 1088. Although, our review of constitutional issues at this stage may no longer be discretionary, we still require the Petitioners to prove that alleged constitutional infirmities are clear or manifest. We stand by our jurisprudence that only in the clearest cases does this Court believe it is warranted to interfere with the people's basic right to vote on important issues by a holding of constitutional infirmity. See In re Initiative Petition No. 360, State Question No. 662, 1994 OK 97, Â¶11, 879 P.2d 810. The constitutional right of the initiative is precious and all doubt should still be resolved in favor of the initiative. See In re Initiative Petition No. 403, 2016 OK 1, Â¶3, 367 P.3d 472. This constitutional power reserved to the people of this State[15] should not be crippled, avoided, or denied by technical construction by the courts. Id. 

Â¶24 Petitioners First Amendment challenges were previously addressed in In re Initiative Petition No. 420, State Question No. 804, 2020 OK 9, Â¶Â¶27-33, 458 P.3d 1088. We noted the Supreme Court in Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997), determined "there is no bright line that separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms. Nor is it clear at this stage what basis for review is appropriate, i.e., one based upon conditional hiring decisions or one based upon the Anderson-Burdick framework." In re Initiative Petition No. 420, State Question No. 804, at Â¶33. Although we determined under our discretionary authority we would decline to reach this challenge at this stage of the initiative process, we made a review of the constitutional challenge and essentially determined it was not clearly or manifestly unconstitutional. Id. This was not based, as Petitioners appear to assert, upon having a plaintiff with standing to pursue this issue, but was based upon the fact it is unclear from federal jurisprudence what test to apply. The Respondents also note the Supreme Court has validated as a legitimate state goal similar time restrictions to prohibit changing one's party for partisan reasons. In Rosario v. Rockefeller, the Court affirmed New York's delayed-enrollment scheme which required, in order to participate in a primary election, one must enroll with a party before the preceding general election. 410 U.S. 752, 761 (1973). The Court agreed with the lower court that "[a]llowing enrollment any time after the general election would not have the same deterrent effect on raiding for it would not put the voter in the unseemly position of asking to be enrolled in one party while at the same time intending to vote immediately for another." Id. at 761-62. We find nothing has changed our opinion on this point to make this issue clearly and manifestly unconstitutional today.

Â¶25 Another challenge concerns one of the Petitioners, Laura Newberry, who is the spouse of a former State Senator, Dan Newberry. Senator Newberry resigned from the State Senate on June 6, 2017, to pursue a senior management position. Section 4(B)(2)(b) of IP 426 prohibits a person from serving on the Commission if they or an immediate family member has held a partisan elective office at the Federal, State or political subdivision level in the five years immediately preceding the date of appointment to the Commission. The definition of "immediate family member" includes a spouse. Section 4(A)(9) of IP 426. Since Laura Newberry's husband was a State Senator approximately three years ago, she would be prohibited from serving on the first Commission created by IP 426. The Petitioners assert Laura Newberry's right to equal protection of the laws is being violated by this provision. They assert under a rational basis scrutiny a classification must "rationally further a legitimate state interest." Hendricks, 2013 OK 71 at Â¶9. The prohibition of a former elected official's spouse, they claim, is arbitrary and irrational.

Â¶26 In Hendricks we held an equal protection analysis requires strict scrutiny of a legislative classification when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class, such as, one based on alienage, race or ancestry. Id. The Equal Protection Clause only requires the classification rationally further a legitimate state interest if this heightened review is unwarranted. Id. Here, the Petitioners do not allege Laura Newberry is part of a suspect class. They argue under the holding in Eisenstadt v. Baird, the Supreme Court has held the Equal Protection Clause is violated when unmarried persons are treated differently from married persons. 405 U.S. 438, 454-55 (1972). IP 426 restrictions prohibit a spouse of an elected official from becoming a commissioner within a certain time limit but does not apply to an ex-spouse. Eisenstadt concerned a lecturer, who apparently was not a doctor or pharmacist, that was convicted of a crime for giving away contraceptives to a presumably single woman at Boston University. Id. at 440. Massachusetts law only allowed a doctor or pharmacist to prescribe contraception for the prevention of pregnancy to married persons. Id. at 442. The First Circuit granted Baird's federal writ of habeas corpus and remanded with directions to discharge Baird. Id. at 440. The appellate court had concluded the statutory goal was to limit contraception in and of itself which was a purpose that conflicted with fundamental human rights under Griswold v. Connecticut, 381 U.S. 479 (1965). The Supreme Court affirmed. It held that the statute viewed as a prohibition on contraception per se, violates the rights of single persons under the Equal Protection Clause of the Fourteenth Amendment. Eisenstadt, 405 U.S. at 443. The State could not consistently with the Equal Protection Clause, outlaw distribution to unmarried but not to married persons because in each case the evil, as perceived by the State, would be identical, and the underinclusion would be invidious. Id. at 454. The Court held "by providing dissimilar treatment for married and unmarried persons who are similarly situated, . . . violate[s] the Equal Protection Clause." Id. at 454-55 (emphasis added).

Â¶27 In the present matter, IP 426's temporary prohibition on spouses of elected or former elected officials serving on the Commission is not a fundamental human right nor is Laura Newberry a member of a suspect class. The rational basis for any of the time limited restrictions on being a commissioner is to "curtail partisan gerrymandering" in the redistricting process. See In re Initiative Petition No. 420, State Question No. 804, 2020 OK 10, Â¶7, 458 P.3d 1080. For this purpose, it cannot be said that a spouse of an elected official is similarly situated to a former spouse of an elected official. A spouse of a current or former elected official shares financial interests as well as influence gained from the political career of the current or former elected official, whereas, an ex-spouse would logically not have that same level of connection or interest. The restrictions on being a commissioner do not have to be perfect but must be rational. It is certainly rational to temporarily exclude current and former elected officials and their families from participating in the electoral line drawing process to further the purpose of curtailing partisan gerrymandering in the redistricting process.

Â¶28 Additionally, certain provisions of the Oklahoma Constitution currently prohibit immediate family members from serving on particular bodies. In 1967, State Question 447, a legislative referendum, was passed by a vote of the people and created Article 7B of the Oklahoma Constitution. Section 3 of Article 7B created the Judicial Nominating Commission composed of thirteen members (it currently has fifteen members). A majority of the members of the Commission are not allowed to be licensed to practice law in Oklahoma and other members of this majority are not allowed to be licensed in any state. In 2009, another legislative referendum, SJR 27, was passed by the legislature and sent to a vote of the people as State Question 752. It passed on November 2, 2010, and amended Okla. Const. art. 7B, Â§3, to include a prohibition from serving in the majority of positions on the Commission for such persons who have an immediate family member that is licensed to practice law in any state.[16]

Â¶29 We hold, that under a rational basis test the goal of curtailing partisan gerrymandering in the redistricting process is legitimately supported by the temporary restrictions on membership in the Commission. We do not find that Laura Newberry has been denied equal protection of the laws nor is this membership restriction clearly and manifestly unconstitutional. For the same reasons, we also do not find Petitioner's assertion concerning a "paid consultant" to be clearly and manifestly unconstitutional. Section 4(B)(2)(f) of IP 426 prohibits a person from serving on the Commission if in the last five years prior to appointment they or an immediate family member were an employee or a paid consultant of the Oklahoma State Legislature or the U.S. Congress. Petitioners, without citing any authority, claim the inclusion of "paid consultant" is overbroad because it would, for example, include persons working on the Capitol restoration project. However, it appears obvious why such a provision was included. It is not difficult to see that a person who has benefitted financially from the Oklahoma State Legislature or the U.S. Congress might be influenced by such bodies. The prevention of such influence in the line drawing process is rational and is at the core of IP 426.

Â¶30 Lastly, the Petitioners assert the "retroactivity problem" which was noted by this Court in In re Initiative Petition No. 420, State Question No. 804, 2020 OK 9, Â¶33 n.17, 458 P.3d 1088. In that opinion we said in a footnote:

[I]t is troubling that the proposed petition would appear to prohibit a person from serving as a commissioner if that person had changed their party affiliation within the last four years preceding the appointment. The appointment, by its terms, would exclude anyone who might have changed their party affiliation well prior to the enactment of the proposed amendment thus applying a retroactive restriction.

Id. (emphasis added). The above mentioned provision in IP 420 was amended in IP 426. It now provides that a person would be prohibited from serving on the Commission if they had changed their party affiliation within the four years immediately preceding the date of appointment to the Commission or since the date IP 426 was filed (February 6, 2020), whichever is shorter. Petitioners assert this new provision still prohibits persons from serving on the Commission who changed their party affiliation after IP 426 was filed and before publication was made. What Petitioners are calling a retroactivity problem is based upon the restriction occurring upon the filing of the proposed measure rather than on the date of its enactment, wherein a period of time would have elapsed to put people on notice of the provision prior to it taking effect. Respondents assert that although the Secretary of State published the required notice of the initiative petition on February 13, 2020, newspapers published an article concerning the refiling of the initiative petition immediately after it was filed. In our previous footnote we noted a four-year retroactive period was concerning because it was "well prior to the enactment of the proposed amendment." Id. Although the Proponents of IP 426 did not write the restriction from the period of its enactment but rather the date of its filing, the period has been greatly reduced. This Court has repeatedly recognized the validity of retroactive effects of legislation. Although statutes are presumed to operate prospectively, that presumption is rebutted where the purposes and intention of the Legislature to give a retrospective effect are expressly declared or are necessarily implied from the language used. Wickham v. Gulf Oil Corp., 1981 OK 8, Â¶13, 623 P.2d 613. Petitioners' only cited authority is the mentioned footnote expressing our concern with the previous version of this restriction in IP 420. They cite no legal authority in support of their argument that this revised restriction is unconstitutional. Claims to error for which there is no support in argument and authority are deemed abandoned. Hadnot v. Shaw, 1992 OK 21, Â¶7, 826 P.2d 978; See Fent v. Contingency Review Board, 2007 OK 27, Â¶22, 163 P.3d 512 ("We need not consider challenges that are not rested on convincing argument firmly supported by legal authority."). As with the other challenged restrictions in IP 426, we do not find this revised restriction on serving on the Commission is clearly or manifestly unconstitutional.

IV. CONCLUSION

Â¶31 In order to protect the constitutional and precious right of the people of this state to propose laws and constitutional amendments, a challenger to an initiative petition still bears the burden of demonstrating the proposed initiative petition contains clear or manifest facial constitutional infirmities. See In re Initiative Petition No. 403, 2016 OK 1, Â¶3; In re Initiative Petition No. 362, State Question No. 669, 1995 OK 77, Â¶12, 899 P.2d 1145. An original jurisdiction challenge at this stage of the initiative process is realistically one made with short time constraints and a limited record. Ignoring this burden would only promote strategic delays to thwart such proposed measures from receiving a meaningful election. We hold the Petitioners have not met this burden to show the provisions of IP 426 contain clear or manifest facial constitutional infirmities. The time period for filing an application for rehearing is hereby shortened to five business days from the date on which this opinion is filed. See Okla.Sup.Ct.R. 1.13.

INITIATIVE PETITION NO. 426, STATE QUESTION NO. 810 IS
LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF
OKLAHOMA

Â¶32 Gurich, C.J., Darby, V.C.J., Kauger, Winchester, Edmondson, Combs, JJ., and Reif, S.J., concur.

Â¶33 Kane and Rowe, JJ., dissent.

Â¶34 Colbert, J., recused.

FOOTNOTES

[1] IP 420 applied this restriction only to the four years immediately preceding the appointment which, as mentioned, this Court expressed concern about the length of the period of retroactivity.

[2] This is identical to IP 420.

[3] IP 420 also included registered local lobbyists.

[4] This is identical to IP 420.

[5] This provision is limited to nominations in this State. IP 420 left it open to any nominations.

[6] This provision is different from IP 420. Initiative Petition 420 only provided that the commissioner not have been an employee of the state legislature during this period.

[7] The Petitioners rely heavily on Kirkpatrick v. Preisler, 394 U.S. 526 (1969) and Karcher v. Daggett, 462 U.S. 725 (1983).

[8] The Fourteenth Amendment to the United States Constitution provides in relevant part:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[9] The case concerned alleged vote dilution caused by the retention of legislative districts drawn more than half a century prior. 369 U.S. 186, 189-195 (1962). The Court noted much had changed in the population of Tennessee since the last 1901 Apportionment Act. Id., at 192.

[10] Although it is not clear from the following references whether they apply to both congressional as well as state and local districting, footnote 3 of the Opinion provides:

The Constitutions and statutes of ten States--California, Delaware, Hawaii, Kansas, Maine, Maryland, Nebraska, New Hampshire, New York, and Washington--authorize the removal of certain groups from the total-population apportionment base. See App. to Brief for Appellees 1a--46a (listing relevant state constitutional and statutory provisions). Hawaii, Kansas, and Washington exclude certain non-permanent residents, including nonresident members of the military. Haw. Const., Art. IV, Â§ 4; Kan. Const., Art. 10, Â§ 1(a); Wash. Const., Art. II, Â§ 43(5). See also N.H. Const., pt. 2, Art. 9--a (authorizing the state legislature to make "suitable adjustments to the general census ... on account of non-residents temporarily residing in this state"). California, Delaware, Maryland, and New York exclude inmates who were domiciled out-of-state prior to incarceration. Cal. Elec.Code Ann. Â§ 21003(5) (2016 West Cum. Supp.); Del.Code Ann., Tit. 29, Â§ 804A (Supp.2014); Md. State Govt.Code Ann. Â§ 2--2A--01 (2014); N.Y. Legis. Law Ann. Â§ 83--m(b) (2015 West Cum. Supp.). The Constitutions of Maine and Nebraska authorize the exclusion of noncitizen immigrants, Me. Const., Art. IV, pt. 1, Â§ 2; Neb. Const., Art. III, Â§ 5, but neither provision is "operational as written," Brief for United States as Amicus Curiae 12, n. 3.

[11] The Commission's Secretary is required to gather information from the Department of Corrections about the home address of state and federal inmates and add this information to the Federal Decennial Census data so that incarcerated people can be counted in their home communities rather than place of incarceration. Sections 4(C)(2)(e) and 4(C)(3)(a) of IP 426.

[12] Fletcher also acknowledged that once Maryland had adjusted the census figures it drew its districts as equally as possible. Fletcher, 831 F.SupP.2d at 895.

[13] Although the petitioners in this case are different, Roger Gaddis is one of the Petitioners in this and in a very recent case with similar First Amendment issues that were raised and rejected by this Court concerning an almost identical initiative petition (IP No. 420); In re Initiative Petition No. 420, State Question No. 804, 2020 OK 9, 458 P.3d 1088.

[14] 2009 Okla.Sess.Laws c. 318, Â§1. New language was added to subsection B of 34 O.S. Â§8 providing "any citizen of the state may file a protest as to the constitutionality of the petition . . .".

[15] Article 5, Section 1, of the Oklahoma Constitution provides: "The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."

[16] Interesting enough, Laura Newberry's husband, then State Senator Dan Newberry, voted "Yea" to pass SJR 27 with these immediate family member restrictions (Oklahoma State Senate, Fifty-Second Legislature, 4th Reading, May 19, 2009).